**Wayne B. ALEXANDER,
Petitioner–Appellant,**

v.

**STATE OF CONNECTICUT,
Respondent–Appellee.**

**No. 378, Docket 88–2318.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 10, 1988.
Decided May 26, 1989.

Susan C. Marks, Asst. State's Atty., Appellate Unit, Wallingford, Conn. (James A. Killen, Deputy Asst. State's Atty., Office of the Chief State's Atty., Wallingford, Conn., of counsel), for respondent-appellee.

Before LUMBARD, VAN GRAAFEILAND and ALTIMARI, Circuit Judges.

LUMBARD, Circuit Judge:

Wayne Alexander, who was convicted in 1980 in the Connecticut Superior Court of having murdered Vern Alan Cook, appeals the dismissal of his writ of habeas corpus in the District of Connecticut, Dorsey, J. Alexander claims that the police used his friend James Papagolas as their undisclosed implied agent to interrogate him in the absence of counsel about the location of Cook's body. Alexander, who was incarcerated on a charge of arson when Papagolas questioned him, asserts that the trial court should have suppressed the second of two confessions he made to Papagolas because it was elicited in violation of his fifth amendment right to the assistance of counsel at custodial interrogations pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Alexander made two confessions to Papagolas, the first on March 19, 1979, that he killed Cook, and the second on March 22, 1979, describing where he had hidden the body. We hold that, although Alexander's first confession was admissible, his second should have been suppressed. Alexander's fifth amendment right to counsel was not violated by the admission of his first confession because Papagolas, at that time, was not acting as a police agent. By the time the second confession was elicited, however, Papagolas was acting as an undisclosed implied state agent and his interrogation of Alexander violated his right to counsel. We accordingly reverse the judgment of the district court and remand for the entry of an order granting the writ and the release of Alexander on the murder charge, unless he is retried within a reasonable time.

I.

Wayne Alexander and Vern Cook were codefendants in a third-degree larceny case. On January 23, 1979, the day they were scheduled to appear in court in Rockville, Connecticut, the courthouse was seriously damaged by fire. Their court appearances were therefore continued to February 6, 1979. When Cook failed to appear on that date, the state police began to search for him.

On March 9, 1979, Alexander admitted to the police that he had set the Rockville courthouse on fire and implicated Cook, who was still at large. Alexander was immediately arrested for arson.

Before taking Alexander to jail, four state police troopers accompanied him home to say goodbye to his wife and child. In the presence of the officers, Alexander received a call from his friend, James Papa-

golas. Papagolas frequently saw Alexander socially and had helped him find a job about two years earlier. Alexander told Papagolas that he had been arrested for arson and asked that he visit him in prison. He also said that the police suspected that Cook was dead. One of the officers, Sergeant John Jacewicz, testified that he noted Papagolas's name for future reference.

Papagolas and Alexander's wife were the only people listed by Alexander on his visiting card at the Hartford Correctional Center where he was held. On March 14, Papagolas visited Alexander. They discussed the arson and Alexander asked Papagolas to sell one of his cars in order to raise cash for Alexander's wife and to satisfy a debt that he owed Papagolas. After the visit, Papagolas drove to Rockville to prepare Alexander's car for sale. As he opened the trunk, Sergeant Jacewicz and Trooper John Rearick, who were patrolling the area, recognized the car and pulled up to question Papagolas about his relationship to Alexander. The officers asked Papagolas whether he knew Cook and his whereabouts and indicated they suspected that he had met with foul play. Papagolas said he did not know where Cook was and mentioned that he intended to visit Alexander again. He said he would let the police officers know if he heard anything about Cook.

Alexander had come to know Cook in the year before his arrest; Papagolas had been Cook's friend for over eight years. Cook often babysat for Papagolas's children and Papagolas once found him a job and let him stay in his home for several months.

On March 15, Papagolas visited Alexander without notifying the police. Later that day he had a conversation with Mrs. Alexander concerning any firearms Alexander might have had. She said that if her husband kept any guns, they would be in the car.

The next day, March 16, Papagolas called Jacewicz and Rearick to say that he would be junking Alexander's car and had heard that it might contain weapons or ammunition. When the officers arrived, Papagolas had just discovered some .38 caliber bullets in the glove compartment and handed them to the officers. The police asked him to call if he learned anything about Cook.

On March 17, Alexander's lawyer, who represented him on the arson charge, notified the police that his client did not wish to talk to the police without his being present.

On March 19, Papagolas drove to the Hartford jail without notifying the police. He told Alexander that the police had asked him about Cook. Papagolas said he had to know, "for his own peace of mind," whether Alexander killed Cook. After a moment of thought, Alexander replied, "for your peace of mind, I did." He explained that Cook had possessed information that could have incriminated Alexander. Papagolas immediately asked whether the body was well hidden. At first Alexander said it was, but then indicated he was not sure. He said he preferred not to talk about where the body was hidden. When the morning visiting period ended, Alexander asked Papagolas to return that evening.

Angry that Alexander had killed his friend, Papagolas wanted him to be punished for having done such "a useless, senseless act." He telephoned Jacewicz soon after he left the prison saying, "[y]ou guys were right. He's dead. I just talked to Wayne and he told me he did it." Jacewicz and Rearick immediately drove to meet him and Papagolas related his conversation with Alexander in detail.

Jacewicz asked Papagolas whether he intended to visit Alexander again. They told him they had conducted a routine check prior to meeting him that day, which revealed that his driver's license had been suspended. They therefore agreed to provide him with transportation to and from the Hartford jail, which was about 20 miles from his home in Rockville.

The record is unclear as to the precise wording of the officers' questions. Jacewicz testified that although he and Rearick did not specifically tell Papagolas to go to the jail for them, they "certainly made it obvious" that they would gladly listen to any information he got. Papagolas told them he was confident that Alexander would eventually tell him where he had

hidden the body. Papagolas testified that the police did not ask him to visit or speak to Alexander, but he admitted, on cross-examination, that he had previously testified that Jacewicz had offered him a ride and specifically asked him to get more information from Alexander. During the suppression hearing, Papagolas testified as follows:

Q. So it was your curiosity and the request from the Connecticut State Police meant nothing to you?

A. They asked me if I found anything out, would I tell them, and I said, yes, I would.

Q. They also asked you to see if you could get more information?

A. Yes, and I went along, you know, with my own curiosity, finding out, and they were also curious.

After Papagolas told Jacewicz and Rearick about Alexander's confession on the morning of March 19, he visited the jail three times, on the evening of March 19, on March 20 and on March 22. On each occasion the police picked Papagolas up in Rockville, drove him in their car to the Hartford jail, waited for him in the parking lot and discussed his conversation with Alexander during the return trip.

When the police drove Papagolas home from his visit on the evening of March 19, the first occasion on which the police had provided him with transportation, he reported that Alexander was worried that Cook's body would be found. Alexander did not want to tell Papagolas where he had hidden it. When Papagolas mentioned that Alexander has asked him to return the following day, Jacewicz and Rearick offered to drive him.

On the return trip from his visit to Alexander on the evening of March 20, Papagolas told Jacewicz and Rearick that during his visit Alexander said he did not feel comfortable that the police had been speaking to Papagolas and again expressed concern lest Cook's body be discovered. He hoped it would rain so that the body would decay more rapidly. Trying to trick Alexander into telling him where the body lay, Papagolas offered to cover it with lime to make it decompose more quickly. Alexander, however, repeated that he did not wish to disclose the body's location at that point, but would have his wife call Papagolas if he changed his mind. Alexander would only say that he picked Cook up in his car and drove him out of town to shoot him. The officers asked that Papagolas notify them if Mrs. Alexander called.

On March 21, Mrs. Alexander called Papagolas and asked him to visit her husband that evening. Papagolas, however, did not want to see him that day. That evening, when Jacewicz telephoned Papagolas to ask if Mrs. Alexander had called, he said he had not heard from her.

On the morning of March 22, Papagolas called Jacewicz and Rearick to tell them that he had received a message that Alexander wanted to speak to him; they picked him up at his place of business and transported him to the jail. During this visit, Alexander said he had reconsidered and wanted Papagolas to put lime on the body and remove any identification from it. Alexander told Papagolas that he would kill him if he disclosed the body's location. He then gave Papagolas precise directions to the wooded glen where the corpse could be found.

When Papagolas left the jail, Jacewicz and Rearick were having dinner, so he was met by another squad car. Papagolas waited until Jacewicz and Rearick returned and informed them that he had learned where the body was. The police followed his directions and, several hours later, discovered the body in a small clearing in the woods.

Papagolas did not visit Alexander again. On April 2, 1979, Alexander called him at work to ask what he had told the police. Papagolas replied that he told them what he knew. Alexander asked him not to testify against him, but Papagolas said he would, if asked to. Alexander hung up and Papagolas called Jacewicz and informed him of the conversation.

On September 17, 1979, Alexander was indicted for murdering Cook. On May 15, 1980, following a pretrial hearing, the court

denied Alexander's motion to suppress Papagolas's testimony about his two confessions as violative of his rights under the fifth and sixth amendments. When Alexander renewed his motion to suppress in mid-trial and again at the end of the evidence, the court denied the renewed motion on each occasion.

On July 2, 1980, the jury found Alexander guilty of murder and, on July 11, the court sentenced him to a term of twenty-five years to life. Five years later, on August 6, 1985, the Connecticut Supreme Court, Peters, C.J., approved the admission of the confessions and affirmed the judgment. *State v. Alexander*, 197 Conn. 180, 496 A.2d 486 (1985). The court ruled that no custodial interrogation had occurred within the meaning of *Miranda*. Papagolas, the court held, was acting as a private citizen and not as an agent of the police because his initial decision to visit Alexander did not involve the police, as he was prompted by curiosity and personal concern for the victim, and because his contact with the police during the entire period was minimal.

On June 7, 1988, the district court adopted the recommended ruling of Magistrate Thomas Smith that Alexander's petition for habeas corpus be denied and found that Alexander had exhausted his state remedies.

## II.

Alexander asserts that, after his first confession to Papagolas on March 19, the police used Papagolas as their undisclosed agent to interrogate him in jail in circumvention of his demand that counsel be present during any questioning. He maintains that, under the cumulative pressures of Papagolas's questioning in the coercive environment of the jail, he was compelled to relate where he had hidden the body. He accordingly argues that the trial court should have suppressed his second confession because it was obtained in violation of his implicit fifth amendment privilege against self-incrimination pursuant to *Miranda*. On appeal, Alexander makes no claim that the first confession should be suppressed.

Although the fifth amendment contains no explicit reference to a right to counsel, the Court in *Miranda* fashioned rules to safeguard a defendant's privilege against self-incrimination when he is subject to "custodial interrogation," which it defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. In arguing that his *Miranda* rights had been triggered when he made his second confession, therefore, Alexander must show (1) that Papagolas was an agent of the police, and (2) that the confession was elicited under official compulsion.

■ We first consider whether Papagolas was acting as an agent of the state when he interrogated Alexander. The prosecution asserts Papagolas's encounters with the police did not exhibit the requisite "degree of prearrangement" or "ongoing cooperation" to compel a finding of agency because Papagolas acted throughout on his own initiative, prompted by curiosity and personal concern for the victim, and was promised no benefit in return for his efforts. *Thomas v. Cox*, 708 F.2d 132, 137 (4th Cir.1983), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262.

We disagree. Although Papagolas was not a state agent on March 19 when Alexander first confessed that he killed Cook, he had become an undisclosed implied government agent by March 22 when he elicited Alexander's second confession describing where he had concealed the corpse.

It is true that the police were not involved in Papagolas's initial decision to visit Alexander. They did not know about his first visit to the jail on March 14, his second on the 15th, or his third on the morning of the 19th, when Alexander told him, "for [his] own peace of mind," that he had killed Cook. Officers Jacewicz and Rearick first met Papagolas by chance in a parking lot on the 14th. Although Jacewicz had made a mental note of Papagolas's

name when Papagolas telephoned Alexander at home on March 9, the police had made no attempt to contact him by the time of the first confession. In discussing Cook with Alexander, Papagolas was motivated by curiosity and concern for his missing friend. The police did not have sufficient involvement in, or knowledge of, Papagolas's visits to support the claim that there was an agency relationship when Alexander first confessed to Papagolas on March 19. We agree with the Connecticut Supreme Court, and Alexander no longer disputes, that the first confession is admissible.

Following that first confession, however, the police took the initiative. They persuaded Papagolas to continue his visits to Alexander and advise them about what he learned. They telephoned Papagolas on March 21 to find out whether he had received a call from Mrs. Alexander. They specifically asked him to get more information from Alexander. Jacewicz and Rearick took Papagolas in their police cruiser from Rockville to the Hartford jail, a distance of approximately 20 miles, on each of his final three visits, including that of March 22, when Papagolas elicited a description of where the body was concealed. On each occasion, Jacewicz and Rearick either waited for Papagolas outside the prison or arranged for other officers to wait for him. Each time they debriefed Papagolas on the ride back to his home. They refrained from giving him a citation for having driven without a license. We find that after Alexander's first confession on March 19, Papagolas became an undisclosed implied agent of the police for the purpose of interrogating Alexander about where he had hidden Cook's body.

We next consider whether the confession was elicited under official compulsion. The state argues that, because Alexander considered Papagolas to be his friend and because the purpose of *Miranda* is to protect a suspect only where there is an atmosphere of official coercion, he could not have felt the pressures contemplated by *Miranda,* even if Papagolas is found to be a state agent. The prosecution claims that the language of *United States v. Henry,*

447 U.S. 264, 272, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115 (1980)—that "the Fifth Amendment has been held not to be implicated by the use of undercover Government agents before charges are filed because of the absence of the potential for compulsion"— is applicable in all cases, even those in which the allegedly "coercive" questioning takes place in jail. The state concludes that Alexander's fifth amendment right to counsel was not violated because Papagolas's questioning did not amount to custodial interrogation in an atmosphere of coercion. We disagree.

■ The *Miranda* safeguards apply in situations in which an incarcerated suspect is interrogated about an offense other than the one for which he is imprisoned. *See Mathis v. United States,* 391 U.S. 1, 4, 88 S.Ct. 1503, 1504, 20 L.Ed.2d 381 (1968). When Papagolas visited Alexander after his request for counsel, his fifth amendment rights under *Miranda* had attached even though Papagolas's questioning involved an offense other than the one for which he was incarcerated. *Arizona v. Roberson,* —— U.S. ——, 108 S.Ct. 2093, 2099, 100 L.Ed.2d 704 (1988).

"[T]he presumption raised by a[n] [incarcerated] suspect's request for counsel— that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance—does not disappear simply because the police have approached the suspect, still in custody, still without counsel, about a separate investigation." *Id.* Thus, where a suspect is in an inherently coercive environment such as a jail or a place where his freedom is significantly restricted, the interrogation is in custodial surroundings even though the suspect believes he is speaking to a friend. *See, e.g., United States v. Brown,* 466 F.2d 493, 459 (10th Cir.1982); *United States v. Surridge,* 687 F.2d 250, 253 (8th Cir. 1982), *cert. denied,* 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 614 (1982).

The state argues, however, that Alexander's presence in jail did not itself automatically create a coercive atmosphere. In a prison context, the state contends, "coer-

cion" is a relative concept which "implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." Counsel cites *Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir.1978) and *United States v. Conley*, 779 F.2d 970, 972 (4th Cir.1985), *cert. denied*, 479 U.S. 830, 107 S.Ct. 114, 93 L.Ed.2d 61 (1986), in which questioning in prison was held to be uncoercive and therefore outside the scope of *Miranda*.

These cases are inapposite. The decisions in *Cervantes* and *Conley* both turned on the common fact that the questioning occurred in relatively uncoercive areas of the prison such as the library and the medical conference room. Moreover, unlike Papagolas's questioning, which took place over several days and focused on obtaining specific information, the questioning in *Cervantes* and *Conley* was not conducted with the express purpose of eliciting incriminating statements.

Alexander also points to several factors beyond his incarceration that increased his sense of coercion. Papagolas deliberately employed tricks to win Alexander's trust and purposefully added to his anxiety. By suggesting that he could help to prevent the discovery of the body by hastening its decomposition, Papagolas persuaded Alexander to depend on him. After having twice said that he did not wish to disclose the location of the body, Alexander finally gave in to the inherent psychological pressures of the jail environment. There are "powerful psychological inducements to reach for aid when a person is in confinement.... [C]onfinement may bring into play subtle influences that will make [the defendant] particularly susceptible to the ploys of undercover Government agents." *United States v. Henry*, 447 U.S. at 274, 100 S.Ct. at 2188. The use of Papagolas by the police in a carefully orchestrated sequence of questioning designed to elicit a confession violates *Miranda* 's bar against "all types of questioning and psychological ploys, calculated or reasonably likely to produce the desired result." *State v. Graham*, 186 Conn. 437, 441 A.2d 857 (1982).

 Alexander's second confession was not a spontaneous, unsolicited statement, but a product of the pressures of Papagolas's systematic questioning in compliance with the requests of the police while Alexander was in custody and after he had demanded counsel. Alexander's implicit fifth amendment rights under *Miranda* were therefore violated.

Finally, we note that the state obviously thought that, in addition to the first confession, it would be necessary to locate Cook's body so that there could be no reasonable doubt regarding Cook's fate. The second confession, leading to the location of the body, resolved that doubt. Thus the admission of the second confession cannot be considered harmless error.

Reversed and remanded for the entry of an order releasing Alexander from custody on the murder conviction unless he is retried within a reasonable time.