**Wayne B. ALEXANDER,**
Petitioner–Appellant,

v.

**STATE OF CONNECTICUT,**
Respondent–Appellee.

**No. 378, Docket 88–2318.**

United States Court of Appeals,
Second Circuit.

Submitted after Remand Sept. 17, 1990.

Decided Oct. 30, 1990.

Gary D. Weinberger, Asst. Federal Public Defender (Thomas G. Dennis, Federal Public Defender, D. Conn., Hartford, Conn., of counsel), for petitioner-appellant.

Susan C. Marks, Asst. State's Atty., Appellate Unit, Office of The Chief State's Atty., Div. of Crim. Justice, Wallingford, Conn., for respondent-appellee.

Before LUMBARD, VAN GRAAFEILAND and ALTIMARI, Circuit Judges.

LUMBARD, Circuit Judge:

As instructed by the Supreme Court in *Meachum v. Alexander*, —— U.S. ——, 110 S.Ct. 2607, 110 L.Ed.2d 628 (1990) we reconsider, in light of *Illinois v. Perkins*, —— U.S. ——, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), decided one week earlier, Alexander's appeal from the denial by the district court for the District of Connecticut of Alexander's petition for a writ of habeas corpus. The district court denied Alexander's claim that the admission of his second confession made to a friend during his imprisonment, on other charges, violated his fifth amendment right to the assistance of counsel in such a custodial investigation. We reversed and directed the issuance of the writ in *Alexander v. Connecticut*, 876 F.2d 277 (2d Cir.1989).

In *Illinois v. Perkins*, the Supreme Court pointed out that, in cases where a confession is made in prison, there is a heavy burden on the state to show that coercion played no part in the making of such confession. The state can meet that burden by showing that the confession is freely given to someone who is trusted by the defendant, even though such receiver of the confession is acting in cooperation with the police.

In *Perkins*, the state placed an undercover agent in the prison to elicit statements regarding a murder from an inmate who was being held for aggravated battery. The inmate proceeded to confide in the undercover agent, relating specific details of the murder. The agent did not give the inmate the *Miranda* warnings prior to the conversations. The Supreme Court held that the inmate's confessions were admissible as they were not the product of a "custodial interrogation." *Perkins*, 110 S.Ct. at 2397. Justice Kennedy wrote that the rationale underlying *Miranda* and its progeny dictate that the warnings are only necessary during "incommunicado interrogation of individuals in a police-dominated atmosphere." *Perkins*, at 2397 (*quoting Miranda v. Arizona*, 384 U.S. 436, 445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694). The court went on to reason that when an incarcerated suspect believes he is conversing with a fellow inmate, there is no reason to fear that the former's words will be motivated by the reaction he expects from his listeners. *Perkins*, at 2397. Thus, the concerns underlying *Miranda* are inapplicable in the undercover agent context, even when the suspect is incarcerated. *Id.*

The record shows that Alexander's second confession to his friend, James Papagolas, was not made in a police dominated atmosphere. The confession was freely made to Papagolas when he visited Alexander at Alexander's request.

I.

In early 1979, Alexander and Vern Alan Cook were codefendants on a third degree larceny charge. The night before their trial was to commence in Rockville, Connecticut, Alexander and Cook set fire to the courthouse. As a result, their court appearances were continued for two weeks to February 6th.

On March 9, 1979, Alexander admitted to the police that he had set the Rockville courthouse on fire and implicated Cook, who was still at large. Alexander was immediately arrested for arson.

Before taking Alexander to jail, four state police troopers accompanied him home to visit his wife and child. In the presence of the officers, Alexander received a call from his friend, James Papagolas. Alexander told Papagolas that he

had been arrested for arson and asked Papagolas to visit him in jail. He also told Papagolas that the police suspected that Cook was dead. One of the officers, Sergeant John Jacewicz, noted Papagolas's name for future reference.

At his March arraignment on the arson charge, Alexander requested an attorney. The court then appointed counsel for him.

On March 14, Papagolas visited Alexander at the Hartford Correctional Center. They discussed the arson and Alexander asked Papagolas to sell one of his cars in order to raise cash for Alexander's wife and to satisfy a debt that Alexander owed Papagolas. After the visit, Papagolas drove to Rockville to prepare Alexander's car for sale. As he opened the trunk, two police officers, Sergeant Jacewicz and Trooper John Rearick, who were patrolling the area, recognized the car and approached Papagolas to question Papagolas about his relationship with Alexander. The officers also asked Papagolas whether he knew Cook and his whereabouts and indicated they suspected that he had met with foul play. Papagolas said he did not know where Cook was and mentioned that he intended to visit Alexander again. He said he would let the police officers know if he heard anything about Cook, who had been Papagolas' friend for more than eight years.

On March 16, Papagolas called Jacewicz and Rearick to say that he would be junking Alexander's car and had been told by Alexander's wife that it might contain weapons or ammunition. When the officers arrived, Papagolas had just discovered some .38 caliber bullets in the glove compartment and handed them to the officers. The police asked him to call if he learned anything about Cook.

On March 17, Alexander's lawyer, appointed to represent him on the arson charge, notified the police that his client did not wish to talk to the police without him being present.

On March 19, Papagolas visited Alexander. He told Alexander that the police had asked him about Cook. Papagolas said he had to know, "for his own peace of mind,"

whether Alexander killed Cook. After a moment of thought, Alexander replied, "for your peace of mind, I did." He explained that Cook had possessed information that could have incriminated him in the arson charge. Papagolas asked whether the body was well hidden. At first Alexander said that it was, but then indicated he was not sure. He said he preferred not to talk about where the body was hidden. When the morning visiting period ended, Alexander asked Papagolas to return that evening. Papagolas testified that he was angry that Alexander had killed his friend, and that he wanted him to be punished for having done such "a useless, senseless act." He telephoned Jacewicz soon after he left the prison saying, "[y]ou guys were right. (Cook)'s dead. I just talked to Wayne and he told me he did it."

Jacewicz asked Papagolas whether he intended to visit Alexander again. They told Papagolas that they had conducted a routine check prior to meeting him that day, which revealed that Papagolas' driver's license had been suspended. They therefore agreed to provide him with transportation to and from the Hartford jail, which was about 20 miles from his home in Rockville.

Papagolas was driven to the jail by Jacewicz and Rearick on three occasions. For each visit with Alexander, the police would meet Papagolas at his Rockville home, drive him to the Hartford jail, wait for him in the parking lot and discuss the conversation with Alexander during the return trip.

When the police drove Papagolas home from his visit on the evening of March 19, he reported that Alexander was worried that Cook's body would be found. Alexander did not want to tell Papagolas where he had hidden it. When Papagolas mentioned that Alexander had asked him to return the following day, Jacewicz and Rearick offered to drive him.

On the return trip from his March 20 visit with Alexander, Papagolas told Jacewicz and Rearick that during his visit Alexander said he did not feel comfortable that the police had been speaking to Papagolas and again expressed concern lest Cook's

body be discovered. He hoped it would rain so that the body would decay more rapidly. To persuade Alexander to tell him where the body was, Papagolas offered to cover it with lime to make it decompose more quickly. Alexander, however, repeated that he did not wish to disclose the body's location, but would have his wife call Papagolas if he changed his mind. Alexander would only say that he picked Cook up in his car and drove him out of town to shoot him.

On March 21, Mrs. Alexander called Papagolas and asked him to visit her husband that evening. Papagolas did not visit Alexander until the next day. During this visit, Alexander said he had reconsidered and wanted Papagolas to put lime on Cook's body and remove any identification from it. Alexander told Papagolas that he would kill him if he disclosed the body's location. He then gave Papagolas precise directions to the wooded glen where the corpse could be found.

Several hours later, the police discovered the body in a small clearing in the woods.

## II.

On September 17, 1979, Alexander was indicted for the murder of Cook. On May 15, 1980, following a pretrial hearing, the court denied Alexander's motion to suppress Papagolas's testimony about his two confessions as violative of his rights under the fifth and sixth amendments. The court denied similar motions at mid-trial and at the end of the evidence.

On July 2, 1980, the jury found Alexander guilty of murder and, on July 11, the court sentenced him to a term of twenty-five years to life.

Five years later, on August 6, 1985, the Connecticut Supreme Court, Peter, *C.J.*, approved the admission of the confessions and affirmed the conviction. *State v. Alexander*, 197 Conn. 180, 496 A.2d 486 (1985). The court ruled that no custodial interrogation had occurred within the meaning of *Miranda.* Papagolas, the court held, was acting as a private citizen and not as an agent of the police because his initial decision to visit Alexander did not involve the

police. Rather, Papagolas was prompted by curiosity and personal concern for the victim, and his contact with the police during the entire period was minimal.

On June 7, 1988, the district court for the District of Connecticut, Peter Dorsey, *Judge*, adopted the recommendation of *Magistrate* Thomas Smith which found that Alexander had exhausted his state remedies, and hence denied his petition for a writ of habeas corpus. We reversed that ruling and remanded for an order releasing Alexander from custody on the murder conviction unless he was retried within a reasonable time. *Alexander v. Connecticut*, 876 F.2d 277 (2d Cir.1989). The Supreme Court granted certiorari and vacated our judgment with instructions to reconsider in light of *Illinois v. Perkins.*

## III.

■ Alexander's conversations with Papagolas occurred while the former was in custody, in the Hartford Correctional Center. Because of the extensive police initiation, support and encouragement of the conversations, we previously held that Papagolas was a police agent. 876 F.2d 277. However, the defendant had no reason to suspect that his friend was working for the police. Alexander freely confessed the murder and disclosed the location of Cook's corpse believing that Papagolas would aid him in making the body more difficult to identify. The conversations did not take place in a police-dominated atmosphere.

This court previously held that Alexander's second confession, disclosing the location of the corpse, was taken in violation of the fifth amendment right to counsel, because at that time, Papagolas was an agent for the government, and the defendant was not given his *Miranda* warnings prior to the meetings with Papagolas. However, Alexander had no reason to suspect his friend of working for the police. The confessions, freely made to Papagolas, show that he had no reason to believe Papagolas was cooperating with the authorities.

As in *Perkins*, the confessing suspect had no intimation that he was in the pres-

ence of a government agent. Because *Miranda* and its progeny were directed to prevention of coercion in custodial interrogation settings, the fears motivating exclusion of confessions are simply not present in the case at bar. *See Perkins,* 110 S.Ct. at 2397. The *Miranda* "custodial interrogation" involves two elements. The suspect must be in police custody, and he must be aware that he is being interrogated by government authorities or their representatives. Deception which takes advantage of a suspect's misplaced trust in a friend does not implicate the right against self-incrimination nor the fifth or six amendment rights to counsel. *See id.* at 2398.

■ Alexander now argues that this case can be distinguished from *Perkins* in that Alexander allegedly asserted his right to counsel prior to the Papagolas conversations. On March 17, Alexander's attorney, who had been assigned to represent Alexander on the arson charge, telephoned the State Police to notify them that his client did not want to be questioned further in the absence of counsel. However, the question of whether an attorney may assert his or her client's right to counsel on an agency basis, *cf. Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (custodial suspect's waiver of his right to counsel is valid even though, without his knowledge or request, a third party retained an attorney for him who was seeking to consult with him), need not be addressed in this case.

Regardless of whether Alexander properly invoked his right to counsel, there is no support for the concept of a fifth amendment right to counsel which bars conduct not prohibited by *Miranda* itself. *See e.g. People v. Crusoe,* 433 Mich. 666, 692, n. 41, 449 N.W.2d 641, 652 (1989), *citing* Berger, *Compromise and Continuity: Miranda Waivers, Confession Admissibility, and the Retention of Interrogation Protections,* 49 U.Pitt.L.Rev. 1007, 1009, n. 9. It

is the fifth amendment's prohibition against compelled self-incrimination which provides the constitutional underpinning for the prophylactic *Miranda* rules, including notice of the right to counsel. Absent a police dominated interrogation, the fifth amendment right to counsel does not attach.

■ Moreover, the Supreme Court's sixth amendment decisions in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) and *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) are of no aid to Alexander. Those cases preclude the government from using an undercover agent to circumvent the sixth amendment right to counsel once a suspect has been charged with the crime. After charges have been filed, the government may not interfere with an accused's right to counsel. *Moulton,* 474 U.S. at 176, 106 S.Ct. at 487. Here, no charges for the murder of Cook had been filed against Alexander at the time of the Papagolas conversations. He had been charged only with arson when he confessed to the Cook murder.[1]

### IV.

We hold that admission of the second confession at petitioner-appellant's state criminal trial was not error. The judgment of the district court which denied Alexander's petition for a writ of habeas corpus is affirmed.

---

**1.** Although Alexander's request for counsel at his arraignment on the arson charge triggered his sixth amendment right to counsel with respect to the arson charge, the police were free to question him, in the absence of counsel, in connection with Cook's murder investigation.

*Maine v. Moulton,* 474 U.S. 159, 180 n. 16, 106 S.Ct. 477, 489 n. 16, 88 L.Ed.2d 481 (1985) ("Incriminating statements pertaining to other crimes, as to which the sixth amendment right has not yet attached, are, of course, admissible at a trial of those offenses.")