THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JOHN LATONA, Defendant-Appellee.

Second District   No. 2—90—0034

Opinion filed September 16, 1991.

Daniel A. Fish, State's Attorney, of Dixon (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

G. Joseph Weller and David W. Devinger, both of State Appellate Defender's Office, of Elgin, for appellee.

PRESIDING JUSTICE REINHARD delivered the opinion of the court:

On December 27, 1989, the circuit court of Lee County granted defendant's, John Latona's, motion to suppress certain statements made by him to an undercover police officer on May 16, 1989, and June 1, 1989, and granted a supplemental motion to suppress a recorded telephone conversation between defendant and the same undercover officer on June 21, 1989. The State appeals pursuant to Supreme Court Rule 604(a)(1) (134 Ill. 2d R. 604(a)(1)).

The sole issue presented for review on this appeal is whether the trial court erred in granting defendant's motions to suppress based on a finding that an undercover police officer was compelled to give defendant the *Miranda* warnings.

Defendant was an inmate at the Dixon Correctional Center. He was charged by information filed in the circuit court of Lee County with one count of solicitation of murder and one count of solicitation of murder for hire (Ill. Rev. Stat. 1989, ch. 38, pars. 8—1.1, 8—1.2). The charges alleged that on May 16, 1989, defendant requested Randall Jordan to commit the offense of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1)) and procured Randall Jordan to commit first-degree murder pursuant to an agreement whereby Jordan would kill Danny Shamoon and defendant would "return the favor" upon his release from the Department of Corrections.

At the hearing on defendant's motions to suppress statements, Officer Jerry Sternes, a lieutenant with the Illinois Department of Corrections assigned as the investigator at Dixon Correctional Center, Dixon, Illinois, testified that he had a conversation with Michael Wagers, an inmate at the Dixon Correctional Center, in mid-March 1989. During this conversation, Wagers revealed that there was an inmate

who wanted a "hit" done on someone "on the street." Later, Wagers again talked with Sternes and told him that John Latona, defendant, wanted to have his daughter's boyfriend, Danny Shamoon, killed. Wagers also indicated that defendant was offering $2,500 and some furniture to the person who would commit the offense.

Randall T. Jordan, a police officer with the Rock Falls police department temporarily assigned to the Illinois Department of Criminal Investigation, was asked to assist in the investigation. Officer Jordan, using the alias "Randy Peterson," entered the Dixon Correctional Center posing as the brother of inmate Michael Wagers, to play the role of a hit man. Defendant had previously submitted the name Randy Peterson on the visiting add-on list for May 16, 1989. Officer Jordan was wearing jeans, cowboy boots, a dark sweatshirt, black vest, sunglasses and an Easy Rider bandanna. He also wore an earring and had a beard. Jordan was wearing an electronic surveillance device.

After identifying himself as someone who could arrange a murder, Jordan asked defendant to tell his story. Although Jordan did not testify to the actual conversation on this date or to a subsequent conversation with defendant on June 1, 1989, tape recordings of the conversation and transcripts of the tapes were admitted into evidence. While the tapes and transcripts are not contained in the record on appeal, the memorandum opinion of the trial judge contains quotations from the transcripts of the conversations which the parties have used in the statement of facts in their briefs.

Jordan questioned defendant by stating: " 'What if he comes up dead?' " and then " 'The only thing I'm concerned about is what happens if as a result of the situation that he comes up dead? That's not going to bother you?' "

Jordan later asked defendant, " 'All right, what do you want from me?' " to which defendant replied:

> " 'Just, just, just deal out justice. Your justice will be my justice. Put the fear of God in him, put him in the hospital, break his legs, whatever you do is just. Your justice will be my justice. If you gotta make him see his maker, so be it. So be it, as he has put a thorn in my side, so shall I be a thorn in his side. An eye for an eye, and a tooth for a tooth. It's in, that's in our bible.' "

The conversation lasted approximately one hour and took place at the visitors' center of the Dixon Correctional facility. The visiting room is an entirely open area about 30 by 60 feet with a bricked courtyard. There were guards occasionally passing through the area,

and there were several other inmates in the visiting room. Defendant was free to leave the visitors' center at any time.

On June 1, 1989, Officer Jordan again met with defendant in the courtyard area of the visitors' room at the Dixon Correctional Center for about one hour. Jordan was dressed similarly to what he wore on May 16, and an eavesdropping device was again used. The following dialogue was recorded:

"RANDALL JORDAN: 'And uh, you want the guy broke up, or do you want him wasted, eliminated and out of your life.'

JOHN LATONA: 'I want him in the hospital, just put him in the hospital, so he's laying in that bed, but if you see, if, if you see your future is extreme then so be it.'

RANDALL JORDAN: 'Well the thing is, if you want him broke up, we can't do it, because, and the reason is, is I was assuming that we wouldn't have no problems, all right.' "

The conversation also contained the following:

"RANDALL JORDAN: 'So basically, you know, if we were to do it, we'd have to hit him, and you know, eliminate him, and that's it, all right?'

JOHN LATONA: 'Yea.'

RANDALL JORDAN: 'Cause if all you want is you want him broke up, I don't know what to tell you.'

JOHN LATONA: 'Yea, well ***'

RANDALL JORDAN: 'But we don't want to take the chance.'

JOHN LATONA: 'All right, when they take him out then, I'll shed a tear.'

RANDALL JORDAN: 'You still want us to do it?'

JOHN LATONA: 'Yes.' "

Jordan testified that he did nothing to force the defendant to speak with him on either May 16 or June 1 and that defendant was free to end either conversation at any time. At no time did Jordan identify himself as a police officer, nor did he indicate that he would divulge the contents of their conversation to the authorities. Officer Jordan did not give *Miranda* warnings to defendant at any point during either conversation or during a telephone conversation on June 16, 1989. At no time did he threaten defendant with immediate or future violence.

At the suppression hearing, Jordan stated that he was aware of the possible solicitation charges that might be filed against defendant. One of the purposes of his conversations with defendant was to obtain incriminating statements from him. Jordan admitted that sometimes

it is important to try to isolate the interview and that one technique is to gain the confidence of the suspect.

The trial judge, in a memorandum opinion, held that the statements made by defendant to undercover officer Jordan on May 16, 1989, and June 1, 1989, without being advised of the *Miranda* warnings must be suppressed pursuant to *People v. Perkins* (1988), 176 Ill. App. 3d 443, 531 N.E.2d 141. The recorded telephone conversation of June 21, 1989, was also suppressed under the "Fruit of the Poisonous Tree Doctrine." The court further held that there was nothing in the record to indicate that defendant's statements were the product of compulsion or coercion and were voluntarily made.

The Illinois Appellate Court decision in *Perkins* has been subsequently reversed by the United States Supreme Court in *Illinois v. Perkins* (1990), 496 U.S. 292, 110 L. Ed. 2d 243, 110 S. Ct. 2394. Accordingly, the lower court's suppression order, although properly following precedent at that time, is now incorrect.

■ The Supreme Court in *Perkins* held that *Miranda* warnings are not required when a suspect in custody is unaware that he is speaking to a law enforcement officer and gives a voluntary statement. (*Perkins*, 496 U.S. at 294, 110 L. Ed. 2d at 249, 110 S. Ct. at 2395-96; see also *People v. Johnson* (1990), 197 Ill. App. 3d 762, 555 N.E.2d 412.) *Miranda* warnings were meant to preserve the privilege during incommunicado interrogation of individuals in a police-dominated atmosphere. That atmosphere is said to generate inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. (*Perkins*, 496 U.S. at 296, 110 L. Ed. 2d at 250, 110 S. Ct. at 2397.) *Miranda* is not implicated in conversations between suspects and undercover agents. The police-dominated atmosphere and compulsion are not present when a prisoner speaks freely to an undercover agent. (*Perkins*, 496 U.S. at 296, 110 L. Ed. 2d at 251, 110 S. Ct. at 2397.) Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns. *Perkins*, 496 U.S. at 297, 110 L. Ed. 2d at 251, 110 S. Ct. at 2397-98.

At the time of the statements in question, defendant was visiting with undercover officer Jordan in a rather large and open visitation area of the Dixon Correctional Center. Defendant placed the name "Randy Peterson" on the visitation list and was free to end their conversation at any time. Jordan did not use the environment to subjugate defendant's will to his own. The location of the conversation was the same place any inmate would meet with visitors, so the environ-

ment added no pressure. Defendant was not aware that Jordan was a police officer. We conclude that the facts here are within the rule established in *Perkins* and the *Miranda* warnings were not required.

Defendant argues, however, that "the undercover officer herein deceptively impelled the defendant to inculpate himself in the inchoate crime of solicitation of murder, a crime he did not initially intend to commit." In this regard, "[w]hen Jordan did not hear words amounting to the crime of solicitation of murder, however, he disingenuously manipulated the defendant, who was obviously emotionally distraught over the perceived degradation of his daughter's life, into committing a more serious inchoate offense than he intended."

In this case, however, the trial judge specifically found that defendant's statements were voluntarily made and were not the product of compulsion or coercion. Whether a statement is voluntary depends on the totality of the circumstances, and a trial court's finding that a statement was voluntary will not be disturbed unless it is against the manifest weight of the evidence. *People v. Evans* (1988), 125 Ill. 2d 50, 76-77, 530 N.E.2d 1360.

▮ Nevertheless, defendant contends that the trial court did not focus on his argument that he was manipulated into committing a more severe offense when the court found the statements voluntary. However, we think that defendant confuses the concept of "interrogation" with police "entrapment," the latter concept being an appropriate defense at trial. Here, undercover officer Jordan's deception and conversation on the record provided do not amount to any type of coercion which would implicate due process concerns as to the voluntariness of the statements as found by the trial judge. The essence of defendant's argument is that he was entrapped. This argument is more properly reserved for the trier of fact when the case is heard on the merits.

Accordingly, for the reasons stated above, we reverse the trial court's order suppressing defendant's statements of May 16 and June 1, 1989, and the order suppressing the June 21, 1989, telephone conversation which was based on the order suppressing the earlier two statements.

Reversed.

BOWMAN and NICKELS, JJ., concur.