STATE of Alaska, Petitioner,

v.

Barry Anthony ANDERSON, Respondent.

No. A–8756.

Court of Appeals of Alaska.

July 22, 2005.

W.H. Hawley Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Petitioner.

Quinlan Steiner, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for the Respondent.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

The defendant in this case, Barry Anthony Anderson, was arrested for a robbery. After the police advised him of his *Miranda* rights, he invoked his right to counsel. Anderson remained in jail because he was unable to make bail.

During their continued investigation of this robbery, the police learned that Anderson might have been involved in a separate robbery/homicide.[1] The police enlisted a friend of Anderson's, Eric Colvin, to visit Anderson

---

1. A detailed description of this police investigation is found in our prior opinion, *State v.* *Anderson,* 73 P.3d 1242, 1243–45 (Alaska App. 2003).

in jail and try to get him to make incriminating statements about this separate criminal episode. Anderson was eventually indicted for this robbery/homicide, based in part on the statements that Anderson made to Colvin during these jail visits.

Following his indictment, Anderson asked the superior court to suppress his statements to Colvin. Anderson pointed out that the United States Supreme Court has held that when a defendant invokes the *Miranda* right to counsel while being interrogated with respect to one offense, that invocation of the right to counsel prohibits the police from interrogating the defendant with respect to *any* offense (unless the defendant's counsel is present).[2] Based on this law, Anderson argued that since the police were prohibited from interrogating him about the robbery/homicide in the absence of his attorney, it was fundamentally unfair for the police to circumvent Anderson's assertion of the right to counsel by sending an informer to the jail to speak to him and try to elicit incriminating statements about the robbery/homicide. The superior court agreed with Anderson and, accordingly, suppressed the challenged statements.

We conclude that *Miranda* does not apply to statements elicited by a false friend—an acquaintance of the defendant who is sent to elicit incriminating statements. Although, as in this case, the conversation between the defendant and the false friend may take place in jail, it is not a "custodial interrogation" for *Miranda* purposes. Defendants in this situation are not subjected to the types of inherent psychological pressures that *Miranda* was designed to prevent or counteract, so the *Miranda* safeguards do not apply. Accordingly, we reverse the decision of the superior court.

*Federal and state law on this issue*

■ In *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), the Supreme Court considered the question of whether an undercover agent who is sent to question an incarcerated defendant about a separate crime (*i.e.*, a crime unrelated to the crime for which the defendant is jailed) must administer a *Miranda* warning to the defendant.

The defendant in *Perkins* was in jail, awaiting trial for aggravated battery. An undercover agent, posing as a fellow inmate, was placed in Perkins's cellblock to question him about an unrelated murder.[3] This undercover agent asked Perkins whether he had ever killed anyone; in response, Perkins gave a detailed description of the murder that the police were investigating.[4]

The Supreme Court granted certiorari "to decide whether an undercover law enforcement officer must give *Miranda* warnings to an incarcerated suspect before asking him questions that may elicit an incriminating response."[5] And, ultimately, the Supreme Court concluded that no warnings were needed.

The Court explained that the purpose of the *Miranda* warnings is "to preserve the [Fifth Amendment privilege against self-incrimination] during incommunicado interrogation of individuals in a police-dominated atmosphere."[6] Because a defendant's conversation with an undercover police agent does not share the aspects of inherent coercion that characterize an incommunicado interrogation by the police, *Miranda* does not apply:

Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*. The essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from

---

2. *McNeil v. Wisconsin*, 501 U.S. 171, 177, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991); *Arizona v. Roberson*, 486 U.S. 675, 677–78, 682–85, 108 S.Ct. 2093, 2096, 2099–2100, 100 L.Ed.2d 704 (1988).

3. *Perkins*, 496 U.S. at 295, 110 S.Ct. at 2396.

4. *Id.*

5. *Id.*, 496 U.S. at 295–96, 110 S.Ct. at 2396.

6. *Id.*, 496 U.S. at 296, 110 S.Ct. at 2397, quoting *Miranda v. Arizona*, 384 U.S. 436, 445, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

the perspective of the suspect. When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking.

*Perkins,* 496 U.S. at 296, 110 S.Ct. at 2397 (internal citations omitted).

The rationale of *Perkins* would seemingly apply to Anderson's case. In fact, Anderson's situation held even less potential for coercion or importuning than the facts of *Perkins.* Rather than being confined in the same cell block with the police informer, Anderson received Colvin in the visitors' area of the jail. As the attorneys explained during the oral argument of this case, Anderson and Colvin were separated by a glass partition, and they had to use an internal telephone to speak to each other. If Anderson had wished to end a conversation with Colvin, he could have done so by simply hanging up the phone.

It is nevertheless true that the situation in *Perkins* differs in one key respect from the facts of Anderson's case: Anderson had previously invoked his *Miranda* (Fifth Amendment) right to counsel. As the superior court noted when it granted Anderson's suppression motion, at least one member of the *Perkins* court—Justice Brennan—believed that the Court's ruling (that interrogation by an undercover agent could take place without *Miranda* warnings) would not apply if the defendant had previously invoked the Fifth Amendment right to counsel. In an unnumbered footnote to his concurring opinion, Justice Brennan wrote:

> Nothing in the Court's opinion suggests that, had respondent previously invoked his Fifth Amendment right to counsel or right to silence, his statements [to the undercover officer] would be admissible. If respondent had invoked either right, the inquiry would focus on whether he subsequently waived [that] right.

*Perkins,* 496 U.S. at 300 n. \*, 110 S.Ct. at 2399 n. \*.

But, as Professor LaFave notes in his text on criminal procedure, the approach suggested in Justice Brennan's concurrence (his proposal that there should be a different rule for defendants who have previously invoked their *Miranda* right to counsel) is "inconsistent with the analysis of the *Perkins* majority".[7] The courts that have addressed this issue since *Perkins* agree with Professor LaFave. These courts have concluded that if the interaction between the defendant and the informer or undercover agent does not qualify as a "custodial interrogation" for *Miranda* purposes, then there is no violation of the defendant's *Miranda* rights—even if the defendant has previously invoked the *Miranda* right to counsel.

For instance, in *Alexander v. Connecticut,* 917 F.2d 747 (2nd Cir.1990), the defendant was arrested for arson (for setting fire to a courthouse). Alexander's attorney notified the police that Alexander did not wish to speak to the authorities unless his attorney was present.[8]

Alexander had had an accomplice, a man named Cook, but Cook disappeared after the fire. The police suspected that Alexander had murdered Cook, so they enlisted the help of a man named Papagolas, who was friends with both Alexander and Cook.[9] The police took Papagolas to visit Alexander in prison several times.[10] After each visit, Papagolas would brief the police on what Alexander had told him.[11] Alexander eventually told Papagolas that he had killed Cook, and Alexander disclosed the location of Cook's body.[12] Based in part on his statements to Papagolas, Alexander was convicted of Cook's murder.

Following his conviction, Alexander sought a federal writ of habeas corpus, arguing that the government should not have been allowed to use his statements to Papagolas.

---

7. Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* (2nd ed.1999), § 6.7(c), 2005 Supplement, p. 122 (new text inserted after footnote 115 of the main text).

8. *Alexander,* 917 F.2d at 749.

9. *Id.*

10. *Id.*

11. *Id.*

12. *Id.* at 750.

Alexander contended that the police had violated his *Miranda* right to counsel—and that the *Perkins* decision should not control his case because he (unlike the defendant in *Perkins* ) *had* invoked his right to counsel before the police sent the informer to visit him in prison.

The Second Circuit rejected Alexander's argument and found that *Perkins* controlled:

[T]here is no support for the concept of a fifth amendment right to counsel which bars conduct not prohibited by *Miranda* itself. It is the fifth amendment's prohibition against compelled self-incrimination which provides the constitutional underpinning for the prophylactic *Miranda* rules, including notice of right to counsel. Absent a police dominated interrogation, the fifth amendment right to counsel does not attach.

*Alexander,* 917 F.2d at 751 (internal citations omitted).

In another federal case, *United States v. Stubbs,* 944 F.2d 828 (11th Cir.1991), Stubbs and Edwards were arrested for conspiracy to import cocaine into the United States. Stubbs invoked her *Miranda* right to counsel. However, while Stubbs and Edwards shared a cell, Stubbs made self-inculpatory statements to Edwards, and Edwards later divulged those statements to the prosecutor.[13]

Stubbs cited Justice Brennan's concurrence in *Perkins* for the proposition that the rule of *Perkins* should not apply to cases in which a defendant has affirmatively invoked the *Miranda* right to counsel—that, instead, the government should be obliged to show that the defendant affirmatively waived their previously invoked right to counsel.[14] But the Eleventh Circuit, like the Second Circuit, held that there is no violation of a defendant's *Miranda* rights when the interaction between the defendant and the informer is not a "custodial interrogation" for *Miranda* purposes. The court noted that the United

States Supreme Court's decision in *Rhode Island v. Innis*[15] was inconsistent with the analysis proposed by Justice Brennan in his concurring opinion in *Perkins:*

The *Innis* Court was faced with [analogous] facts, as the suspect there invoked his *Miranda* rights to silence and counsel. But, the *Innis* Court concluded that because "respondent was not 'interrogated' for *Miranda* purposes, we do not reach the question whether the respondent waived his right under *Miranda* to be free from interrogation until counsel was present." Because we conclude [that] *Miranda* was not implicated by the conversation between Edwards and Stubbs, we need not reach the issue of waiver.

*Stubbs,* 944 F.2d at 832–33 n. 3.[16]

For state court decisions taking this same approach, see *State v. Hall,* 204 Ariz. 442, 65 P.3d 90, 100 (2003); *People v. Guilmette,* 1 Cal.App.4th 1534, 2 Cal.Rptr.2d 750, 752–54 (1991); *People v. Latona,* 218 Ill.App.3d 1093, 161 Ill.Dec. 846, 579 N.E.2d 394, 397 (1991).

Finally, this Court followed this same approach in *Carr v. State,* 840 P.2d 1000 (Alaska App.1992). In *Carr,* we were asked to decide whether a prison inmate (serving a sentence on unrelated charges) was subjected to custodial interrogation in violation of *Miranda* when the state troopers enlisted the inmate's girlfriend to telephone him in prison and try to get him to make self-incriminatory statements about his suspected sexual abuse of a child.[17]

Because the girlfriend telephoned Carr at the behest of the state troopers, and because her conversation with Carr was calculated to elicit incriminating statements from him, we assumed (without deciding) that Carr was subjected to police interrogation during the telephone conversation.[18] However, we then explained that not all police interrogations were covered by *Miranda:*

---

**13.** *Stubbs,* 944 F.2d at 831.

**14.** *Id.* at 832–33 n. 3.

**15.** 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

**16.** Quoting *Rhode Island v. Innis,* 446 U.S. at 298 n. 2, 100 S.Ct. at 1688 n. 2.

**17.** *Carr,* 840 P.2d at 1002.

**18.** *Id.* at 1003.

Just as compulsory self-incrimination presupposes some kind of compulsion, . . . "custody," for *Miranda* purposes, presupposes at least some minimal element of coerciveness. . . . The standard for determining *Miranda* custody is objective: *Miranda* warnings are required [when] police interrogation [is] conducted under circumstances in which a "reasonable person would feel he was not free to leave and break off the questioning". *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979).

*Carr*, 840 P.2d at 1003.

Examining the circumstances of the case, we concluded that Carr's interrogation had not been custodial. First, Carr was unaware that his girlfriend was cooperating with the state troopers in their investigation of the suspected sexual abuse. Second, there was nothing in the record to indicate that Carr "was under any degree of compulsion in electing to accept [his girlfriend's] call or that he was in any way inhibited from terminating the call after accepting it." [19] And third, Carr was not in prison as an arrested suspect in the sexual abuse case; rather, he was serving a sentence imposed for an unrelated crime.[20] Based on these factors, and applying the test announced by the Supreme Court in *Perkins*, we concluded that it was "virtually inconceivable that Carr's incriminating statements were in any realistic sense the product of coercion result[ing] from the interaction of custody and official interrogation".[21]

Thus, under both Alaska precedent and decisions from other jurisdictions, the police do not violate *Miranda* by sending a false friend to elicit statements from a defendant unless the interview is custodial. And, as we noted in *Carr*, an interview is custodial for *Miranda* purposes only if a reasonable person in the defendant's position would have believed that they were not free to break off the questioning and leave (or ask the other person to leave).

Anderson cites a single state court decision to the contrary: the decision of the Nevada Supreme Court in *Boehm v. State*, 113 Nev. 910, 944 P.2d 269 (1997). The superior court, in its decision granting Anderson's suppression motion, declared that *Boehm* was "persuasive on this issue".

But *Boehm* does not rest on a different interpretation of the scope of *Perkins*. Rather, *Boehm* rests on an outright rejection of *Perkins*.

The decision in *Boehm* is expressly premised on an earlier decision of the Nevada Supreme Court, *Holyfield v. State*, in which the court declared, as a matter of state constitutional law, that *any* jailhouse questioning by an undercover agent constitutes "custodial interrogation" for purposes of *Miranda*—and that, consequently, all such questioning must be preceded by *Miranda* warnings and a waiver of rights.[22]

The *Holyfield* decision was issued five years before *Perkins* and, at that time, the *Holyfield* court declared that its ruling was based on *both* federal and state constitutional law. In *Boehm* (which was decided seven years after *Perkins*), the Nevada court acknowledged that *Perkins* was directly contrary to *Holyfield's* interpretation of federal constitutional law. Nevertheless, the Nevada court declared, "we hold that our interpretation of the Nevada Constitution in *Holyfield* remains valid".[23] In other words, the decisions in *Holyfield* and *Boehm* are now professedly at odds with federal law, and are squarely based on Nevada's singular definition of custodial interrogation.

In sum, the all-but-unanimous view is that *Miranda* normally does not apply to situations where the police send a "false friend" to elicit statements from a defendant in jail. *Miranda* is intended to counteract "the danger of coercion result[ing] from the interaction of custody and official interrogation". *Perkins*, 496 U.S. at 297, 110 S.Ct. at 2397. "Questioning by captors . . . who appear to

---

**19.** *Id.* at 1004.

**20.** *Id.*

**21.** *Id.*, quoting *Perkins*, 496 U.S. at 297, 110 S.Ct. at 2397.

**22.** 101 Nev. 793, 711 P.2d 834, 836–37 (1985).

**23.** *Boehm*, 944 P.2d at 271 n. 1.

control the suspect's fate ... may create mutually reinforcing pressures that ... will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist." *Id.*, 496 U.S. at 297, 110 S.Ct. at 2397.

When a defendant talks to a fellow inmate or a visiting friend, the coercive atmosphere of custodial police interrogation is absent. As explained by Professor Yale Kamisar in his article, *Brewer v. Williams, Massiah, and Miranda: What Is 'Interrogation'? When Does It Matter?*, 67 Georgetown L.J. 1 (1978):

> One can deliberately elicit incriminating statements from a person without having him realize it—that is what happened in *Massiah [v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) ]. But how can one envelop someone in a "police-dominated atmosphere" without having him realize it? How can one produce an "interrogation environment" well-calculated to "subjugate the individual to the will of his examiner" when the individual is not even aware that he is in the presence of "his examiner"? ... [W]hatever may lurk in the heart or mind of the fellow prisoner (or apparent friend or colleague), if it is not "custodial police interrogation" *in the eye of the beholder*, then it is not such interrogation within the meaning of *Miranda.*

*Id.* at 65 (emphasis in the original) (quoted in *People v. Williams*, 44 Cal.3d 1127, 245 Cal. Rptr. 635, 644–45, 751 P.2d 901, 910 (1988)).

In Anderson's case, the superior court ruled that, because Anderson had previously invoked his *Miranda* right to counsel, the police violated *Miranda* by sending a false friend to visit Anderson in jail in an attempt to elicit incriminating statements from him. For the reasons explained here, we conclude that the superior court misinterpreted the law on this issue. The normal interaction between a jail inmate and a jail visitor is not "custodial interrogation" for purposes of *Miranda*—and thus, even if the visitor is work-

ing for the police as an informant, this tactic does not violate *Miranda.*

*Anderson's argument that the result in his case should be different because he knew that Colvin was working for the police as an informer*

Anderson argues that even if a jail inmate's interaction with a visitor is normally not a "custodial interrogation", we should reach a different result under the facts of his case because (Anderson asserts) he knew that Colvin was working for the police.

Anderson relies on the *Perkins* court's explanation of why an inmate's interaction with a fellow prisoner should not be deemed a custodial interrogation:

> Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that ... will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist.... When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners.... [T]here is no *interplay* between police interrogation and police custody.

*Perkins*, 496 U.S. at 297, 110 S.Ct. at 2397 (emphasis in the original).[24]

Anderson argues that he *did* know that Colvin was a police informer and that his conversations with Colvin would be reported to the police. Thus, according to Anderson, Colvin's visits to Anderson in jail should be deemed custodial interrogations in violation of *Miranda.*

Anderson's contention appears counter-intuitive. Normally, if an inmate were to discover that a repeated visitor was working for the police as an informer, one would expect the inmate to respond with distrust and guarded words rather than ingenuous disclosure. This is because, in most circumstances, the inmate will assume, from the fact that their friend is working as a police informer, that the friend's interests are inim-

---

**24.** Quoting Yale Kamisar, *Brewer v. Williams, Massiah, and Miranda: What Is 'Interrogation'?* *When Does It Matter?*, 67 Georgetown L.J. 1, 63, 67 (1978).

ical to the inmate's interests, and that the friend may be attempting to obtain personal benefit by betraying the interests of the inmate.

Moreover, the record does not bear out Anderson's factual premise that he knew that Colvin was working for the police. During their second conversation, Anderson told Colvin that he had received a warning from a third person that Colvin might be "wired". Upon hearing this, Colvin offered to strip off his clothes to prove that he was not wearing a monitoring device. Anderson replied that he did not believe what he had heard—in large part because Colvin was not asking Anderson any questions during their conversations, but rather appeared to be supplying Anderson with information.

Finally, we note that Anderson could have refused to meet with Colvin—and that, having begun a conversation with Colvin, Anderson was free to discontinue the conversation at any time by simply hanging up the internal phone that allowed communication across the glass barrier.

In fact, even though the superior court granted Anderson's suppression motion, the superior court concluded, "in light of the totality of the circumstances surrounding Mr. Anderson's conversations with Mr. Colvin", that Anderson's conversations with Colvin did *not* qualify as custodial interrogations under the test announced by the Supreme Court in *Perkins* and adopted by this Court in *Carr*. The superior court declared that it was "unlikely that [Anderson's] incriminating statements were made under coercion resulting from the interaction of custody and official interrogation."

We agree with the superior court's interpretation of the record. Even if Anderson suspected (or even thought it likely) that Colvin was working as a police agent, Anderson had complete freedom to refuse to engage in conversation with Colvin. There was no interplay between the fact of Anderson's confinement and the fact that Colvin was attempting to elicit incriminating information from Anderson. Therefore, under *Perkins* and *Carr*, there was no custodial

interrogation—and thus, Colvin's conversations with Anderson did not violate *Miranda*.

*Anderson's request that we interpret the Alaska Constitution to prohibit the tactic used by the police in this case*

■ Anderson argues that even if we conclude that Colvin's conversations with Anderson did not violate *Miranda*, we should nevertheless hold that this police tactic—sending a false friend to speak to a suspect in jail—violates the Alaska Constitution's guarantee of due process of law and its prohibition against compelled self-incrimination.[25]

Anderson concedes that our decision in *Carr* appears to be inconsistent with his proposed interpretation of the Alaska Constitution, but he notes (correctly) that *Carr* involved the surreptitious questioning of a prison inmate who was already serving a sentence for an unrelated crime. Anderson asserts that the police should be prohibited from pursuing this tactic when a defendant is jailed on pending charges (even when these pending charges are unrelated to the matter being investigated).

Anderson's self-incrimination argument is easily resolved. Article I, § 9 of our constitution does not forbid all self-incrimination, but only compelled self-incrimination. And if an inmate's conversation with a false friend does not involve the coercion that would trigger *Miranda* safeguards, then the inmate's self-incriminating statements can hardly qualify as "compelled".

■ Anderson's due process argument has somewhat more force. As we noted earlier, the Nevada Supreme Court held in *Holyfield v. State* that *any* surreptitious questioning of an inmate by an undercover agent or false friend will be deemed a custodial interrogation for *Miranda* purposes. As a practical matter, the Nevada court's ruling forbids this tactic—since the questioner must administer *Miranda* warnings and obtain a waiver of the inmate's rights, thus revealing the questioner's role as a police agent.

Although the *Holyfield* decision is couched in terms of *Miranda*, it is obvious from the

---

**25.** Article I, § 7, and Article I, § 9, respectively.

Nevada court's opinion that the court was offended by the tactic of sending an undercover agent to pose as a fellow inmate. The court declared that since "[t]he police were not allowed to interrogate [the] defendant directly", they should have "no authority ... to do indirectly what they [could] not do directly".[26] In other words, the court seems to have viewed this tactic as fundamentally unfair.

We acknowledge the moral ambiguity in the government practice of sending a false friend to converse with a suspect for the purpose of betraying the suspect's trust by eliciting incriminating information and then reporting this information to the authorities. Nevertheless, we have previously held that the use of informants—even paid informants whose fee is contingent on the outcome of the cases they bring to the police—does not offend due process.[27] We accordingly reject Anderson's argument that, by sending Colvin to visit him in jail, the government violated Anderson's right to due process of law under the Alaska Constitution.

*Conclusion*

We conclude that the police did not violate *Miranda* by sending Colvin to speak to Anderson in jail, when Anderson was free to refuse to meet with Colvin and was free to terminate their conversations at any time. We further conclude that this tactic did not violate Anderson's right to due process under the Alaska Constitution, nor did it violate the Alaska Constitution's prohibition against compelled self-incrimination.

The superior court's decision to suppress Anderson's statements to Colvin is REVERSED.

**26.** *Holyfield,* 711 P.2d at 840, quoting *State v. Travis,* 116 R.I. 678, 360 A.2d 548, 551 (1976).

**27.** *Mustafoski v. State,* 954 P.2d 1042, 1045 (Alaska App.1998); *Jacobs v. State,* 953 P.2d 527, 530–33 (Alaska App.1998).