65 P.3d 90

**STATE of Arizona, Appellee,**

v.

**Henry William HALL, Appellant.**

**No. CR–00–0447–AP.**

Supreme Court of Arizona, En Banc.

March 25, 2003.

day Shelby died. However, the record does not support this assertion.

Janet A. Napolitano, Arizona Attorney General by Kent E. Cattani, Chief Counsel, Capital Litigation Section and James P. Beene, Assistant Attorney General, Phoenix, Attorneys for Appellee.

Thomas A. Gorman, Flagstaff, Attorney for Appellant.

## OPINION

BERCH, Justice.

¶ 1 On September 22, 1999, a jury found Defendant Henry William Hall guilty of felony murder, armed robbery, kidnapping, and theft. The trial judge sentenced him to death for the murder charge, and to terms of years for the other offenses. Because Defendant was sentenced to death for the murder, direct appeal to this court is automatic. Ariz.Rev.Stat. ("A.R.S.") § 13–703.01 (2001) (renumbered A.R.S. § 13–703.04 (Supp. 2002)). We have jurisdiction pursuant to Article 6, Section 5(3), of the Arizona Constitution, A.R.S. § 13–4031 (2001), and Arizona Rule of Criminal Procedure 31.2(b).

## FACTS [1]

¶ 2 In May of 1997, the Phoenix Police received a report that seventy-six year old Ted Lindberry was missing. He has never been seen since. On May 17, 1997, Lindberry's new Chrysler Sebring was the subject of two traffic stops. On the first occasion, Lee Mileham was stopped and arrested for an outstanding warrant. The officer left the Sebring where it was stopped, intending to return after processing Mileham. When the officer returned just over an hour later, the car was gone.

¶ 3 Later that evening, Defendant was approached by officers while he was in the car. He drove away, crashed the car into a curb, and was apprehended after attempting to flee the scene on foot. He was arrested and booked for aggravated assault and escape.

¶ 4 Defendant's arrest while in possession of Lindberry's car raised the suspicion that he might have been involved with Lindberry's disappearance. When questioned by members of the Phoenix Police Department, Defendant denied any knowledge regarding Lindberry's disappearance. Indeed, Defendant denied knowing either Lindberry or Mileham.[2]

¶ 5 During their investigation of Lindberry's disappearance, the police learned that Lindberry had last been seen on April 25, 1997, leaving Shorty's, a bar on Grand Avenue in Phoenix, with Lee Mileham. On April 26, Lindberry's credit card was used at several locations in the valley, including a Super 8 Motel, which charged the card for a room, a bedspread, and sheets. That charge began a trail of activity on the card that led through Tucson, Arizona, El Paso, Texas, and Deming and Las Cruces, New Mexico. The credit card trail ended in Las Cruces, where a clerk seized the card after being alerted that it was stolen. Further investigation showed that between April 26 and May 5, Lee Mileham had forged Lindberry's signature on at least two credit card receipts and a New Mexico hotel register recovered by the police. Additionally, on April 26, Mileham forged Lindberry's signature to gain access to Lindberry's storage unit.

¶ 6 In July 1997, the police were contacted by L.C., an inmate who was incarcerated with Defendant Hall at Madison Street Jail. L.C. called the police several times from the jail to provide information regarding the crimes of various inmates. He eventually arranged to meet with a Phoenix Police Detective to discuss information regarding Defendant's involvement in Lindberry's disappearance. During a series of interviews between July 29 and October 1, 1997, L.C. reported that Defendant told him he had kidnapped, robbed, beaten, and killed Lindberry. Defendant also reportedly told L.C. that after killing Lindberry, he and Mileham had wrapped the body in sheets and dumped it in the desert somewhere be-

---

1. We view the facts in the light most favorable to sustaining the verdict. *State v. Gallegos,* 178 Ariz. 1, 9, 870 P.2d 1097, 1105 (1994).

2. Defendant and Lee Mileham were both subsequently charged with the murder of Ted Lindberry. In a separate trial, Mileham was found guilty of first degree murder and sentenced to life in prison.

tween Phoenix and New Mexico. Lindberry's body has never been recovered.

¶ 7 In the trunk of Lindberry's car, the police discovered some blood and a plastic jug containing urine, which indicated that the victim had met with foul play. The police compared DNA samples from that blood with DNA samples taken from a pillowcase found in Lindberry's apartment and with DNA samples from one of Lindberry's brothers. The DNA samples recovered from the trunk were consistent with both the DNA samples from Lindberry's pillowcase and the DNA samples from his brother. While this evidence strongly suggested that Lindberry met a violent end, it did not directly link Defendant to Lindberry's disappearance and death.

¶ 8 To connect Defendant to Lindberry's murder, the State presented five witnesses, including L.C., who testified that Defendant had made incriminating statements regarding his involvement in Lindberry's disappearance. *See infra* ¶ 30–31, 51–54. Like L.C., each of the other witnesses had questionable credibility. One had a split personality and was under the influence of marijuana when she overheard Defendant's incriminating statements; another was a convicted felon who was on heroin when Defendant made the incriminating statements; the third was incarcerated and, like L.C., hoping for a reduction in sentence based upon his testimony against Defendant; and the fourth was a convicted felon who had been drinking when Defendant made the incriminating statements and was angry with Defendant for purportedly stealing his property.

¶ 9 The only other pieces of evidence linking Defendant to Lindberry's disappearance were two surveillance videos taken at the convenience store in Las Cruces, New Mexico, where Lindberry's credit card was confiscated. The grainy, unclear video shows an individual with glasses and a hat attempting to use Lindberry's stolen credit card. The State argued that the individual in the video was Defendant. Defendant contested the identification, claiming to have been in Phoenix during the last part of April and the beginning of May, not with Mileham.[3] The

store clerk who confiscated the credit card was not allowed to make an in-court identification because he had been unable to pick Defendant from a photo line-up when he was first interviewed by the police. Therefore, whether Defendant was the individual in the videos was a contested fact and a focus of Defendant's case.

## DISCUSSION

### A. Trial Issues

1. *Did the trial court abuse its discretion by denying Defendant's motion for a new trial on the issue of juror misconduct?*

*a. Juror misconduct—background*

¶ 10 Defendant argues that he must be granted a new trial because of prejudicial juror misconduct stemming from the bailiff's presentation of extrinsic evidence to the jury.

¶ 11 On September 13, 1999, the day the jury received the case, the trial court's bailiff quit her job. The next day, Defendant moved for a mistrial, claiming that the bailiff, in response to a question from a juror, had told the juror that Defendant was not in custody. The trial judge acknowledged that he had heard such a story but ruled that, even if such an exchange had occurred, it was not prejudicial.

¶ 12 After the verdict, Defendant filed a motion for a new trial, setting forth several issues, including possible juror misconduct. Three weeks later, Defendant filed a supplemental motion, supported by affidavits from two jurors, alleging that during the trial the bailiff had told jurors that Defendant had tattoos around his wrists that looked like bracelets, a fact not part of the evidence presented at trial, and that the jurors discussed this information during their deliberations. The trial court held an evidentiary hearing at which ten of the twelve jurors who found Defendant guilty testified. Two jurors who deliberated were not present at the hearing.

---

**3.** At trial, Defendant called the administrator of the 7th Avenue Hotel, who testified that room 22

was rented to Defendant from April 24 to May 7, 1997.

¶ 13 During the hearing, it was revealed that while the trial was in progress, the bailiff had told at least one juror, E.C., that Defendant had tattoos on his wrists. Another juror testified that the bailiff pointed to Defendant's wrist during the trial, indicating the presence of tattoos. Testimony revealed that five other jurors overheard the bailiff's conversation with E.C. regarding the tattoos. Of the remaining six jurors who were not present during the conversation with the bailiff, three admitted that they later learned of the evidence, and a fourth, G.C., who testified that he was not aware of the extrinsic evidence, was impeached by an investigator who testified that G.C. told him about the conversations concerning the tattoos. Further evidence revealed that some of the jurors spent time during deliberations methodically watching surveillance videos from the Quick Mart in New Mexico looking for tattoos on the individual who used Ted Lindberry's credit card.

¶ 14 In response to questions from the trial judge, the ten jurors testified that they did not see any tattoos on the person in the videos. At the evidentiary hearing, Defendant's counsel played one of the videos from the Quick Mart to show that a tattoo could be seen. For the record, the trial judge indicated that Defendant has barbed wire tattoos on each wrist.

¶ 15 In a detailed minute entry, the trial judge found that "[u]ndisputed evidence established that the jury engaged in misconduct by receiving and considering extrinsic information that was not admitted at trial." He also observed that when the Quick Mart videos are "carefully examined and stop framed ... a bracelet, watch or bracelet type tattoo can be seen on [Defendant's] left wrist." The court noted, however, that despite the visible wrist mark, "all jurors who testified that they looked for tattoos said that [though] the topic of whether any tattoos could be seen on the subject was discussed amongst the jurors ..., nobody said they saw any tattoos." Therefore, despite the court's having seen what might have been a "bracelet type tattoo," the trial judge denied Defendant's motion, finding "beyond a reasonable doubt that the extrinsic and inadmissible evidence that [Defendant] had tattoos around his wrists did not contribute to the jury verdicts of guilty. [Defendant] has failed to show that he suffered actual prejudice by this improper and extrinsic information being presented to and considered by the jury."

### b. Standard of review

¶ 16 A trial court's decision to grant or deny a new trial based on alleged jury misconduct generally will not be reversed absent an abuse of discretion. *State v. Jones,* 185 Ariz. 471, 484, 917 P.2d 200, 213 (1996). However, a trial court may order a new trial if jurors receive extrinsic "evidence not properly admitted during the trial." Ariz. R.Crim. P. 24.1(c)(3)(i). This court has adopted the Ninth Circuit's standard of review for such issues, which entitles a defendant to a new trial if the jury receives extrinsic evidence and "it cannot be concluded beyond a reasonable doubt that the extrinsic evidence did not contribute to the verdict." *State v. Poland,* 132 Ariz. 269, 283, 645 P.2d 784, 798 (1982) (citing *United States v. Vasquez,* 597 F.2d 192, 193 (9th Cir.1979)). In applying that standard, this court observed that "[a]ny private communication, contact or tampering with a juror gives rise to a strong presumption that the verdict has been tainted." *State v. Miller,* 178 Ariz. 555, 557, 875 P.2d 788, 790 (1994) (citing *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *Mattox v. United States,* 146 U.S. 140, 148–50, 13 S.Ct. 50, 52–53, 36 L.Ed. 917 (1892)). We concluded that "juror misconduct warrants a new trial if the defense shows actual prejudice *or if prejudice may be fairly presumed from the facts." Id.,* at 558, 875 P.2d at 791 (citing *State v. Vasquez,* 130 Ariz. 103, 105, 634 P.2d 391, 393 (1981)). Once the defendant shows that the jury has received and considered extrinsic evidence, prejudice must be presumed and a new trial granted unless the prosecutor proves beyond a reasonable doubt that the extrinsic evidence did not taint the verdict. *Id.* at 558–60, 875 P.2d at 791–93.

### c. Extrinsic evidence

¶ 17 At the evidentiary hearing in the case before us, the trial court correctly noted that

Defendant bore the initial burden of proving that the jurors received and considered extrinsic evidence. In its ruling, the trial court stated that Defendant "failed to show that he suffered actual prejudice." While the court's finding was correct as far as it went, the court failed to address the second part of the inquiry, whether prejudice could be fairly presumed from the facts of the case. *Id.* at 558, 875 P.2d at 791.

¶ 18 In this case, prejudice may be presumed from the facts, for "[i]n a criminal case, any private communication, contact or tampering[,] directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Id.* at 558–59, 875 P.2d at 791–92 (quoting *Remmer,* 347 U.S. at 229, 74 S.Ct. at 451); *cf. Ford v. Wainwright,* 477 U.S. 399, 411, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986) (plurality) ("In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability."); *State v. Vickers,* 138 Ariz. 450, 452, 675 P.2d 710, 712 (1984) (observing that death penalty cases are "treated differently from non-death penalty cases," and finding an appearance of impropriety when a judge who sentenced a defendant to death in a prior case also tried the same defendant in a subsequent capital case). Most of the jurors received extrinsic evidence and considered it during deliberations. The improper evidence was provided to the jury by the trial court's bailiff. And, of course, we cannot know what effect the extrinsic evidence might have had on the two jurors who could not be found, or otherwise did not appear, for the evidentiary hearing. Thus, we cannot avoid the presumption of prejudice to Defendant.

¶ 19 This conclusion is strengthened by analyzing several factors the Ninth Circuit has identified to assist courts in determining whether extrinsic evidence has contributed to a verdict. Those factors are as follows:

1. whether the prejudicial statement was ambiguously phrased;

2. whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial;

3. whether a curative instruction was given or some other step taken to ameliorate the prejudice;

4. the trial context; and

5. whether the statement was insufficiently prejudicial given the issues and evidence in the case.

*United States v. Keating,* 147 F.3d 895, 902–03 (9th Cir.1998) (citing *Jeffries v. Wood,* 114 F.3d 1484, 1491–92 (9th Cir.1997)). Factor four, the trial context, includes

whether the material was actually received, and if so, how; the length of time it was available to the jury; the extent to which the jurors discussed and considered it; whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

*Id.* (quoting *Dickson v. Sullivan,* 849 F.2d 403, 406 (9th Cir.1988)).

¶ 20 We find these factors instructive in the case at bar. While the first factor does not apply, analysis of the second, third, and fourth factors raises a significant concern regarding the impact of the extrinsic evidence on the outcome of this case. The tattoo evidence may have been admissible, but it was not admitted and would not have been merely cumulative of other evidence presented at trial. The only evidence tying Defendant to the Quick Mart in New Mexico—and therefore to the use of Lindberry's credit cards—was the video evidence.[4] The trial court's bailiff told several jurors, outside the trial setting, that Defendant had tattoos on his wrists, a fact never introduced into evidence and one that might have assisted the jurors in identifying Defendant as the person at the Quick Mart who was using Lindberry's credit cards. Several jurors considered and discussed this evidence and looked for tattoos on the individual by viewing the Quick Mart videos and still shots "several times over several days." And final-

4. Recall that the signatures on the credit card receipts were Mileham's.

ly, no curative instruction was given because the court did not know of the situation until after the verdict had been returned. Because Defendant claimed not to have been at the Quick Mart, and because the State offered no other evidence placing Defendant there, his identification as the person in the video was a contested fact that helped tie him to Lindberry's disappearance.

¶ 21 The fifth factor—whether the evidence was "insufficiently prejudicial given the issues and evidence in the case"—asks us to consider the evidence in the context of the case. The identity of the person in the video was vital to the State's case. Given Defendant's claim that it was not he, and given the lack of other evidence tying Defendant to Lindberry's disappearance, we cannot say that the evidence was "insufficiently prejudicial."

¶ 22 Thus, three of the four applicable factors favor the conclusion that the evidence might have affected the verdict. Certainly nothing presented allows us to discount that possibility.

¶ 23 In assessing juror misconduct, this court accords deference to the trial judge who held the evidentiary hearing and was in the best position to assess the effect of the extrinsic evidence. *See State v. Bible,* 175 Ariz. 549, 598, 858 P.2d 1152, 1201 (1993). Although cognizant of the trial court's advantage on this point, we are also mindful that two jurors who sat on the jury that convicted Defendant did not testify at the evidentiary hearing. We have held that "the improper influence of even one juror taints a verdict." *Miller,* 178 Ariz. at 558, 875 P.2d at 791. Thus we cannot underestimate the possible improper effect of the evidence on the missing *two* jurors. Moreover, despite the jurors' statements that the evidence did not sway them, "[t]he effect of extrinsic prejudicial evidence on a juror's deliberation may be substantial even though it is not perceived by the juror and a juror's good faith cannot counter this effect." *Jeffries,* 114 F.3d at 1491 (internal quotation marks omitted).

¶ 24 The trial judge found and it is clear from the transcript of the inquiry that jurors received extrinsic evidence of Defendant's tattoos and considered it during their deliberations. Indeed, the record shows that, individually and in small groups, the jurors scrutinized the videos looking for tattoos on the person in the Quick Mart videos. The record suggests and the trial judge expressly found that in a portion of the Quick Mart videos a bracelet tattoo can be seen on the person using Lindberry's credit card. This extrinsic evidence was improperly brought to the jurors' attention by the court's own bailiff. The identity of the subject in the Quick Mart videos was in question, as the defense at trial was that Defendant was not the perpetrator of the crimes at issue. These factors, coupled with the court's inability to provide a curative instruction or otherwise mitigate the impact of the extrinsic evidence, support rather than defeat the presumption of prejudice.

¶ 25 Although Defendant is not entitled to a perfect trial, only a fair one, *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986), in this case the appearance of impropriety is strong. Dispositively, we cannot say, beyond a reasonable doubt, that the improperly introduced extrinsic evidence did not contribute to the verdict. *See Poland,* 132 Ariz. at 283, 645 P.2d at 798. Under these circumstances, "[t]he right to an impartial jury demands that [we] err in favor of defendant." *Miller,* 178 Ariz. at 560, 875 P.2d at 793. Therefore, we must reverse Defendant's conviction and remand for a retrial.

2. *Did the trial court err in denying Defendant's motion to suppress statements he made to L.C. on or after August 31, 1997?*

¶ 26 Before trial, Defendant moved to suppress statements he made to L.C. while the two were housed together at the Madison Street Jail. The court ultimately denied the motion, a ruling that Defendant challenges as error on appeal. Because this issue may arise on retrial, we address it as follows.

a. *Background of statements*

¶ 27 During Defendant's stay at Madison Street Jail following his May 17 arrest for assault on the police officers at the time of

his arrest, he talked with L.C., another detainee in the same housing block. On May 23, 1997, Defendant was taken to the Arizona Department of Corrections, but was returned to the Madison Street Jail on July 12, 1997. On July 22, Defendant was released on his own recognizance.

¶ 28 Before Defendant was released on July 22, Phoenix Police Detective Daily interviewed him regarding Ted Lindberry's disappearance. Before commencing questioning, Detective Daily read Defendant his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant initially answered questions, but then stopped answering and invoked his *right to remain silent.*[5]

¶ 29 A week later, on July 29, 1997, Detective Daily interviewed L.C. as a follow-up to a call L.C. had made to the silent witness program from jail. The interview concerned incriminating statements Defendant had reportedly made regarding Ted Lindberry's death while Defendant and L.C. were incarcerated together in May 1997. L.C. was interviewed again on July 31 because of a faulty recording of the July 29 interview. Defendant was out of jail from July 22, 1997, through August of that year, but was arrested again on August 31 in connection with the aggravated assault charge and returned to Madison Street Jail.[6] Soon thereafter, L.C. again contacted Detective Daily, who interviewed him on September 29 and October 1, 1997 regarding additional statements Defendant had purportedly made.

¶ 30 At the suppression hearing, L.C. testified that he had been incarcerated with Defendant in May of 1997 and that Defendant had revealed information about a murder he had committed. L.C. contacted the police and asked Detective Daily to talk to the prosecutor on his case. The Detective agreed to do so. After learning additional information during Defendant's subsequent incarceration for the assault charge, L.C. called Detective Daily again.

¶ 31 L.C. testified that during the July 29 and 31 interviews he provided most of the information he had learned from Defendant, but after Defendant was re-arrested he learned specific details of how the victim was beaten, that a key broke off in Lindberry's door, and that Lindberry's credit card was used at a hotel. Some of L.C.'s later conversations with Defendant took place while both were allegedly drunk from home-made prison wine. L.C. stated that, while Defendant initiated the conversation, he encouraged it and did not act at the direction of the police, who had told him that he could not serve as a police agent. In November, 1997, the State rewarded L.C. for his information by dismissing an allegation of a prior conviction at sentencing in exchange for his testimony at Defendant's trial.

### b. The statements at trial

¶ 32 Defendant conceded the admissibility of any statements he made to L.C. before July 22, the day he was read his *Miranda* rights and questioned by Detective Daily, but he moved to suppress any statements made after he was re-arrested on August 31. The trial court granted the motion and suppressed statements Defendant made to L.C. after August 31, 1997, on the ground that L.C. was acting as an agent for the State. The court also found, however, that Defendant's statements were voluntarily made and that there was "no evidence that [Defendant's statements] were in any way the result of any coercion, threats, pressure, promises, et cetera."

¶ 33 Before L.C. testified at trial, he was instructed that he could testify only about conversations he had with Defendant before August 31, 1997. During L.C.'s testimony, Defendant objected and moved for a mistrial, claiming that L.C. testified to statements Defendant made after August 31, 1997, in violation of the court's instructions. The trial court denied the motion, stating that De-

---

**5.** The trial court did not allow into evidence any statements Defendant made after he invoked his right to remain silent.

**6.** This charge stemmed from Defendant's arrest, during which he purportedly drove Lindberry's

car toward a police officer. The charge had nothing to do with the assault, kidnapping, and murder for which he received the death sentence at issue in this case.

fendant could cross-examine L.C. about when he heard the various statements.

¶ 34 During cross-examination of L.C., the State stipulated that L.C. testified regarding some matters not included in the July 29 and 31 interviews. On re-direct, L.C. claimed he had known that information but held it back during the first two interviews.

¶ 35 The trial court considered additional arguments and briefing on whether Defendant's Fifth Amendment *Miranda* rights were violated. On September 2, 1999, relying on *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), the trial court reversed its previous ruling and held that admitting into evidence Defendant's conversations with to L.C. occurring after August 31, 1997, did not violate Defendant's Fifth Amendment rights. The court found that, as in *Perkins*, "admission into evidence of jailhouse admissions made by an uncharged defendant to [an informant] did not violate his applicable Fifth Amendment *Miranda* rights." [7] The court reaffirmed its finding that there was "no evidence that [Defendant's statements to L.C.] were induced by or the result of any coercion, threats, pressure or promises of any sort, direct or indirect[,] by [L.C.]."

¶ 36 The trial court also found that, at the time of Defendant's incarceration for the assault, his Sixth Amendment right to counsel was not violated because Defendant had not been charged with any crimes relating to the disappearance of Ted Lindberry and therefore Defendant's Sixth Amendment right to counsel had not attached. *See Maine v. Moulton*, 474 U.S. 159, 180, 106 S.Ct. 477, 489, 88 L.Ed.2d 481 (1985) (stating that "to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessar-ily frustrate the public's interest in the investigation of criminal activities"); *State v. Hitch*, 160 Ariz. 297, 299–301, 772 P.2d 1150, 1152–54 (App.1989).

### c. Standard of review

¶ 37 Defendant maintains that any statements made to L.C., an agent of the State, after July 22, 1997, should not have been admitted because Defendant invoked his *Miranda* rights during the July 22 interview regarding Lindberry's disappearance. This court reviews a trial court's ruling on a motion to suppress evidence for abuse of discretion. *State v. Jones*, 203 Ariz. 1, 5, ¶ 8, 49 P.3d 273, 277 (2002).

### d. Suppression argument

¶ 38 Defendant argues first that the State must show that he voluntarily waived his rights and, second, citing *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), that the State was prohibited from reinitiating contact with him to obtain a statement. *Edwards* held that once a person invokes the Fifth Amendment right to counsel, the police cannot ask further questions until that person is provided counsel. *Id.* at 484–85, 101 S.Ct. at 1885. *Edwards* is inapplicable in this case, however, because the transcript of Defendant's July 22, 1997 interview with Detective Daily clearly shows that Defendant invoked only his right to remain silent, not his right to counsel.[8] *See Michigan v. Mosley*, 423 U.S. 96, 104 n. 10, 96 S.Ct. 321, 326 n. 10, 46 L.Ed.2d 313 (1975). In *Miranda*, the Court "distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and directed that 'the interrogation must cease until an attorney is present' only '[i]f the individual states that he wants an attorney.' " *Id.* (quoting *Miranda*, 384 U.S. at 474, 86 S.Ct. at 1628). Because

---

7. The court stated that the State and L.C. had reached an understanding that L.C. could act as an agent of the State. This finding contradicts the trial court's earlier recognition that Detective Daily "had no idea that Defendant would ever turn up in the jail again" after his initial interviews with L.C. Moreover, the record reflects that the police had told L.C. that he could **not** be a police agent.

8. The State fails to make this distinction and Defendant's briefs state that Defendant invoked his "rights," implying that he invoked all relevant rights. But the transcript of the interview shows that Defendant invoked only his right to remain silent.

Defendant never requested an attorney, the State could have reinitiated questioning and Defendant's statements would have been admissible as long as the State could show that he knowingly and voluntarily waived his rights.

¶ 39 Inmate L.C. did not read Defendant his *Miranda* rights before their jail cell conversation, nor was Defendant aware that L.C. might have been an agent of the State. But the Supreme Court has held that *"Miranda* warnings are not required when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement." *Perkins,* 496 U.S. at 294, 110 S.Ct. at 2394. For example, in *United States v. Stubbs,* the court held that *Miranda* warnings are not required when "the cellmate is not actually an undercover law enforcement agent but instead is—at best—a confidential informant." 944 F.2d 828, 831–32 (11th Cir. 1991) (footnote omitted). Nor are *Miranda* warnings necessary when a jail visitor acts as an agent of the State. *See Alexander v. Connecticut,* 917 F.2d 747, 750–51 (2d Cir.1990). The Supreme Court has reasoned that the concerns underlying *Miranda* are not implicated in such circumstances because "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate." *Perkins,* 496 U.S. at 296, 110 S.Ct. at 2397. The same is true in this case. Defendant chose to speak to fellow inmate L.C. Thus there has been no violation of Defendant's right to remain silent.

■■■ ¶ 40 Defendant argues that *Perkins* is distinguishable because, unlike the defendant in *Perkins,* he had previously invoked his *Miranda* rights.[9] Defendant relies on Justice Brennan's statement in concurrence in *Perkins* that "[i]f respondent had invoked either [his right to remain silent

or his right to counsel], the inquiry would focus on whether he subsequently waived the particular right." 496 U.S. at 300 n.*, 110 S.Ct. at 2399 n. * (Brennan, J., concurring). Courts that have addressed similar arguments, however, have applied *Perkins* even if a suspect had previously invoked both the right to remain silent and the right to counsel. *See Stubbs,* 944 F.2d at 832 n. 3; *Alexander,* 917 F.2d at 751; *People v. Guilmette,* 1 Cal.App.4th 1534, 2 Cal.Rptr.2d 750, 753–54 (1991). Critical to the analysis is the Supreme Court's reasoning that, absent a custodial interrogation, there cannot be a violation of a defendant's Fifth Amendment *Miranda* rights and thus "there would be no occasion to determine whether there had been a valid waiver" of those rights. *Edwards,* 451 U.S. at 486, 101 S.Ct. at 1885. Here, Defendant's conversations with L.C. were not custodial police interrogations. Consequently, this court need not determine whether Defendant validly waived his rights before speaking to L.C. because Defendant's *Miranda* rights were not implicated. *See id.*[10]

■■■ ¶ 41 Defendant also argues that his statements to L.C. were not voluntary because some of the conversations took place while drinking home-made prison wine. But the trial court found, and the record supports, that there was "no evidence that [Defendant's statements to L.C.] were induced by or the result of any coercion, threats, pressure or promises of any sort, direct or indirect[,] from [L.C.]." The trial court did not err in admitting into evidence all of L.C.'s testimony about his conversations with Defendant.

3. *Did the State establish the corpus delicti and was there sufficient evidence to support the jury's verdict?*

¶ 42 At the close of the State's case, Defendant moved for a judgment of acquittal on

---

9. Recall, however, that Defendant had invoked only his right to remain silent, not his right to counsel. Counsel's statement that Defendant had invoked "his rights" is therefore somewhat misleading.

10. The heading in Defendant's opening brief claims that allowing L.C.'s testimony regarding Defendant's statements after August 31 also violated Article 2, Sections 4 and 24, of the Arizona

Constitution. This argument is not addressed further in the brief, nor was it raised below. Only one state has rejected *Perkins* on state law grounds. *Boehm v. State,* 113 Nev. 910, 944 P.2d 269, 271 & n. 1 (1997). We do not address the question because Defendant has presented no argument to support it. *See State v. Kemp,* 185 Ariz. 52, 57, 912 P.2d 1281, 1286 (1996).

the murder charge, arguing that the State had presented insufficient evidence, that the testimony of the witnesses should be discounted, that the State failed to establish the *corpus delicti* of the crimes charged, and that he could not be convicted solely by his own uncorroborated statements. *See* Ariz. R.Crim. P. 20(a). The trial court denied the motion, calling this "a classic case of circumstantial evidence," and observing that "there's more than substantial evidence to go to the jury on all of these counts."

### a. Corpus Delicti

¶ 43 The State must establish the *corpus delicti* of a homicide by showing that the alleged injury to the victim—death, in this case—occurred and that the injury was caused by criminal conduct rather than by suicide or accident. *State v. Atwood,* 171 Ariz. 576, 598, 832 P.2d 593, 615 (1992), *disapproved on other grounds by State v. Nordstrom,* 200 Ariz. 229, 241, ¶ 25, 25 P.3d 717, 729 (2001); *State v. Gillies,* 135 Ariz. 500, 506, 662 P.2d 1007, 1013 (1983). The *corpus delicti* doctrine incorporates the rule that a defendant cannot be convicted of a crime based solely upon an uncorroborated confession or admission. *Smith v. United States,* 348 U.S. 147, 152, 75 S.Ct. 194, 197, 99 L.Ed. 192 (1954); *Gillies,* 135 Ariz. at 506, 662 P.2d at 1013. But "[o]nly a reasonable inference of the corpus delicti need exist before a confession may be considered." *Gillies,* 135 Ariz. at 506, 662 P.2d at 1013. Evidence supporting that inference can be circumstantial. *Burrows v. State,* 38 Ariz. 99, 112, 297 P. 1029, 1034 (1931), *overruled on other grounds by State v. Hernandez,* 83 Ariz. 279, 282, 320 P.2d 467, 469 (1958). "As long as the State ultimately submits adequate proof of the *corpus delicti* before it rests, the defendant's statements may be admitted." *State v. Jones,* 198 Ariz. 18, 23, ¶ 14, 6 P.3d 323, 328 (App.2000).

¶ 44 In this case, the State showed the following facts. On April 25, 1997, Lindberry had attended a doctor's appointment. He was scheduled for another appointment on May 2, 1997, but never appeared. Before April 25, 1997, Lindberry had been a regular at Shorty's Bar on Grand Avenue. On April 25, 1997, Lindberry received a call from Lee Mileham and told a friend that he was going to meet Mileham and one of Mileham's friends later that evening. Lindberry was last seen leaving Shorty's with Mileham. Defendant and Mileham were later seen in Lindberry's car, without Lindberry, and both were arrested, in separate incidents, while driving Lindberry's car. While riding in the car with Mileham and Defendant, Mileham's son observed a gun in the car.

¶ 45 Lindberry was a very clean and organized person who kept his car and storage unit in immaculate condition. But when the police recovered Lindberry's car, it had been "trashed" and the door handles and speakers had been ripped out. Lindberry's storage unit was also found in disarray. It was known that when Lindberry left town, he usually placed his car in his storage unit. As stated earlier, however, the car was eventually found in Defendant's possession. On April 26, 1997, Mileham signed into the storage unit, misspelling Lindberry's name. Lindberry's passport was found in the storage unit, suggesting that he had not left the country.

¶ 46 Lindberry's credit card was used between April 26 and May 5 in Phoenix and Tucson, Arizona, Deming and Las Cruces, New Mexico, and El Paso, Texas. On May 5, the credit card was finally picked up as stolen, from someone clearly not Lindberry, in a convenience market in Las Cruces. One of the charges on the credit card, incurred at a Super 8 Motel in Goodyear, was for a missing bedspread and sheets.

¶ 47 To further demonstrate that Lindberry had met with foul play, the State presented evidence of blood stains consistent with Lindberry's brother's blood and a one-gallon jug containing human urine found in the trunk of Lindberry's car. The blood found in the trunk also matched six of seven sites of DNA recovered from Lindberry's pillowcase. Although the police conducted three searches, Lindberry's body was never found. This circumstantial evidence, taken together, provided a reasonable basis from which the jurors could infer that Lindberry was dead and that his death resulted from criminal conduct. Thus, the *corpus delicti* was estab-

lished and Defendant's statements to the witnesses who testified were properly admitted.

¶ 48 Defendant contends, however, that "many jurisdictions hold that 'the body of the deceased must be found and identified' " to show *corpus delicti. Harris v. State,* 738 S.W.2d 207, 220 (Tex.Crim.App. 1986). This is incorrect. The body of a missing person generally has not been required to establish the *corpus delicti* for homicide. *E.g., Virgin Islands v. Harris,* 938 F.2d 401, 411, 415 & nn. 11–12 (3d Cir. 1991) (surveying cases and noting that both federal and state cases observe the "no body required" rule). The one notable exception is Texas, which requires that a body be found. *Id.* at 411 n. 10 (citing *Harris,* 738 S.W.2d at 207). Defendant does not argue that Arizona should adopt such a rule and we decline to do so.

### b. Sufficiency of the evidence

¶ 49 Defendant maintains that even if his statements are considered, the evidence was insufficient to sustain his convictions and his motion for a judgment of acquittal should have been granted. "A judgment of acquittal pursuant to [R]ule 20 ... is appropriate only when no substantial evidence warrants a conviction. Substantial evidence is proof that reasonable persons could accept as sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *State v. Spears,* 184 Ariz. 277, 290, 908 P.2d 1062, 1075 (1996) (citation omitted). Although the physical evidence tying Defendant to the crime was minimal,[11] physical evidence is not required to sustain a conviction if the totality of the circumstances demonstrates guilt beyond a reasonable doubt. *State v. Fulminante,* 193 Ariz. 485, 494, ¶ 26, 975 P.2d 75, 84 (1999).

¶ 50 Five witnesses, including L.C., testified about incriminating statements Defendant made. See *supra* ¶¶ 30–31 for L.C.'s statements.

¶ 51 V.C. testified that Defendant stated that he had beaten a guy with the butt of a

gun and dumped the body between Phoenix and New Mexico. Defendant had added that Lindberry's car had not been reported stolen yet.

¶ 52 D.F. testified that he had confronted Defendant and told him that he knew that he had killed the guy who owned the car Defendant was driving and that he did not want to be involved, and Defendant had responded, "[t]hat's cool." D.F. also testified that Defendant had told him that Mileham was "dope sick" and had not participated in the killing and that Lindberry's body was dumped between Phoenix and New Mexico.

¶ 53 D.G. testified that Defendant brought the subject of the murder up on more than one occasion while in jail, and that Defendant made the following statements: Mileham arranged a meeting with an older person whom Mileham knew so that they could rob him. Defendant beat the man and they dumped the body on the east side of the Palo Verde power plant. The body was never found. The victim had a storage unit in which he kept items; Defendant went to the storage unit with someone to get the property and they had a code to get in. Defendant and Mileham used the victim's credit card, drove his car to Las Cruces, New Mexico and back, and one of them had gotten sick. Once they returned to Phoenix, the police had pulled Mileham over while he was driving the victim's car.

¶ 54 S.R. testified that Defendant made the following statements: When S.R. saw Defendant in Lindberry's car, Defendant told him it belonged to an older man. Defendant and Mileham were going to get into the car and rob the car's owner of his cigarettes. During the robbery, Mileham used a pistol and Defendant and Mileham directed Lindberry to drive to the desert. They gave Lindberry a shot of "dope" to calm him down, but he went into convulsions after the shot and died. They dropped the body in the desert somewhere. Mileham was too doped up to remember where they left the body. Defendant grabbed Lindberry's wallet and they took the car. Defendant and Mileham used

---

11. The State introduced substantial physical evidence: blood, urine, saliva, signed receipts, etc. But while this evidence tends to show that Lindberry met with foul play, it does not directly link Defendant to the crimes.

the credit card in the wallet to buy things like VCRs and sold them elsewhere. Defendant and Mileham then drove Lindberry's car to New Mexico, using the credit card to buy gas. Finally, Defendant claimed to have a briefcase of fake Rolexes that he said came from Lindberry's storage unit.

¶ 55 The witnesses' testimony of Defendant's statements, combined with the evidence that Lindberry had met with foul play, was sufficient to support the jury's verdict that Defendant was guilty of felony murder, kidnapping, robbery, and theft. Defendant maintains that the witnesses were not credible and their testimony must be discounted because the witnesses were either jailhouse informants, felons, drug abusers, or a combination of the three. The credibility of witnesses, however, is a matter for the jury. *State v. Cañez*, 202 Ariz. 133, 149, ¶ 39, 42 P.3d 564, 580 (2002). The jury apparently found these witnesses credible despite Defendant's counsel's meticulous impeachment of the witnesses with their prior felonies, their drug and alcohol use, how or whether their substance use affected their recollection of the events to which they testified, and one witness's split personality.

4. *Did the court's reasonable doubt instruction, approved in State v. Portillo, 182 Ariz. 592, 898 P.2d 970 (1995), deprive Defendant of his right to due process of law by lowering the State's burden of proof?*

¶ 56 This court has repeatedly rejected this argument. *See, e.g., Cañez*, 202 Ariz. at 156, ¶ 76, 42 P.3d at 587; *State v. Van Adams*, 194 Ariz. 408, 418, ¶¶ 29–30, 984 P.2d 16, 26 (1999).

**B. Sentencing Issues**

¶ 57 Because we reverse and remand this case for retrial, we do not reach the sentencing issues argued on appeal.

**C. Issues Raised to Avoid Preclusion**

¶ 58 Defendant raises several issues to avoid procedural default and to preserve the issues for further review. Because this court has ordered reversal and remand for a new

trial based on juror misconduct, we do not address these issues at this time.

### CONCLUSION

¶ 59 We affirm Defendant's conviction for the theft of the vehicle, and, for the foregoing reasons, we reverse the convictions for murder, armed robbery, and kidnapping and the sentences thereon, and we remand the case for further proceedings consistent with this opinion.

CONCURRING: CHARLES E. JONES, Chief Justice, RUTH V. McGREGOR, Vice Chief Justice, STANLEY G. FELDMAN, Justice (retired), and MICHAEL D. RYAN, Justice.