NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

VINCENT QUIMAYOUSIE, *Appellant.*

No. 1 CA-CR 14-0749
FILED 3-15-2016

---

Appeal from the Superior Court in Maricopa County
No. CR2012-148862-001
The Honorable Sam J. Myers, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Craig W. Soland
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Terry J. Reid
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Patricia K. Norris delivered the decision of the Court, in which Presiding Judge Jon W. Thompson and Judge Maurice Portley joined.

---

**N O R R I S**, Judge:

**¶1**         Vincent Quimayousie appeals his convictions and sentences for first degree felony murder, attempted armed robbery, and misconduct involving weapons, arguing the superior court should have prohibited three witnesses from identifying him at trial; instructed the jury on their identifications; severed the misconduct charge from the other charges; granted his *Batson* challenge; declared a mistrial because of juror misconduct; barred the State from dismissing the first degree murder charge based on premeditation; and instructed the jury on certain lesser-included offenses. We reject these arguments and affirm Quimayousie's convictions and sentences.

**FACTS AND PROCEDURAL BACKGROUND[1]**

**¶2**         On the evening of September 13, 2012, Quimayousie approached the victim, the victim's two younger sisters (including witness C.M., *see infra* ¶ 5), and two younger cousins as they walked through a city park; he demanded their money at gunpoint. For no apparent reason, Quimayousie then fired his gun at the victim, striking him in the chest and killing him. A jury found Quimayousie guilty on the charges specified above.

**DISCUSSION**

I.     Witness Identifications

**¶3**         Quimayousie first argues the superior court abused its discretion when it allowed three witnesses—M.P., C.M., and C.G.—to identify Quimayousie at trial. *State v. Moore*, 222 Ariz. 1, 7, ¶ 17, 213 P.3d

---

[1]"We construe the evidence in the light most favorable to sustaining the verdict, and resolve all reasonable inferences against the defendant." *State v. Greene*, 192 Ariz. 431, 436, ¶ 12, 967 P.2d 106, 111 (1998) (citation omitted).

150, 156 (2009). Even if we assume the circumstances surrounding the pretrial identification were inherently suggestive (contrary to the superior court's finding), the circumstances were not, however, otherwise unreliable. *See infra* ¶¶ 9-10. Thus, we reject this argument. *State v. Dessureault*, 104 Ariz. 380, 384, 453 P.2d 951, 955 (1969) (if defendant challenges proposed in-court identification, state must prove the circumstances surrounding any prior identification were not unduly suggestive); *and see State v. Rojo-Valenzeula*, 237 Ariz. 448, 450, ¶ 7 n.1, 352 P.3d 917, 919 n.1 (2015) (although *Dessureault* and other cases used the term "unduly suggestive," supreme court used the term "inherently suggestive" for clarity and consistency; "[a]n inherently suggestive identification procedure triggers the need for a reliability analysis to determine whether the identification is admissible.").

A.     Factual Background[2]

¶4        M.P. saw Quimayousie in the park before he shot the victim. It was "a little bit dark" when Quimayousie passed "very close" by her with a gun in his hand as she sat on a park bench with her daughter playing nearby. She became frightened and "scanned [Quimayousie] completely," looked at his face, which was uncovered, and noted his features and clothing. She observed that Quimayousie appeared to be a thin Hispanic male, 5' 6" to 5' 8", who wore a dark, black or navy blue hat.[3] After he passed, M.P. watched Quimayousie interact with another person in the park and then walk out of sight. Shortly after, she heard gunshots.

¶5        C.M., then 11 years old, saw Quimayousie during the shooting itself. As noted, she was the victim's sister and was with the victim, their sister, and two cousins in the park. C.M. watched Quimayousie approach the group and noted he wore a black hat, a black shirt, and jeans. She could see Quimayousie's eyes even though he wore a bandana around his mouth and nose. She also noted that Quimayousie carried a revolver. It was "fairly dark," but she could clearly see Quimayousie. Quimayousie demanded money from the group and shot the victim as C.M. stood approximately a yard and a half away. She then

---

[2]We review the ruling on a pretrial identification based solely on the evidence admitted at the evidentiary hearing. *Moore*, 222 Ariz. at 7, ¶ 17, 213 P.3d at 156.

[3]Although the witnesses told police he appeared Hispanic, Quimayousie is Native American.

watched Quimayousie as he made his way through the family members and jogged away.

¶6        C.G. saw Quimayousie as he fled from the park and attempted to hide from police.  She was on the outskirts of the park with her brother and another person, riding bicycles, when they heard shots.  C.G.'s brother told them to "Go. Go." because he saw who he believed was the shooter coming towards them, but the group continued to ride nonchalantly because they did not want Quimayousie to notice them or come over to them.  Although Quimayousie was three to four houses away from her, C.G. watched him run to a house that was only "a couple" of houses from her own house.  She watched Quimayousie pound on the door of the house and try to enter.  She then went to her own house and continued to watch Quimayousie from the curb.  Even though it was dark, security lights on the other house provided illumination.  Quimayousie eventually "hunched down" and tried to hide.  C.G. watched Quimayousie for what seemed to her like "forever," but which she admitted could have been "minutes."  She described Quimayousie to police as a Hispanic male, approximately 5' 5" tall, wearing a black shirt, black pants, and a black cap.

¶7        Police presented two people to each witness in separate one-on-one identification procedures about 30 to 40 minutes after the shooting.  An officer gave each witness a form of the one-on-one identification admonition and then had each witness sit in a police vehicle while the police presented each subject in the vehicle's spotlight.

¶8        M.P. was "80% sure" Quimayousie was the person she had seen.  She said it was only 80% because he was no longer wearing a hat.  C.M. was "absolutely positive" it was the same person even though Quimayousie was no longer wearing his bandana.  C.G. was "sure" he was the person she had seen.  All three witnesses said the other subject police presented was not the man they had seen.

        B.        Discussion

¶9        One-person "show-up" identifications, such as those used here, are inherently suggestive. *State v. Williams*, 144 Ariz. 433, 439, 698 P.2d 678, 684 (1985).  Even if a superior court finds the circumstances surrounding a prior identification inherently suggestive, however, the court may still admit the prior identification if it determines the identification was otherwise reliable under the totality of the circumstances. *State v. Osorio*, 187 Ariz. 579, 581, 931 P.2d 1089, 1091 (App. 1996).  Factors the court must consider as part of the totality include: (1) the witness's

opportunity to view the defendant at the time of the offense; (2) the witness's degree of attention; (3) the accuracy of any prior description of the defendant by the witness; (4) the witness's level of certainty at the identification; and (5) the length of time between the crime and the identification. *Id.*

**¶10**        Applying these factors, the superior court also found the identifications were reliable. Each witness had ample opportunity to view Quimayousie, and each explained why she had focused her attention on him. *See State v. Alvarez*, 145 Ariz. 370, 372, 701 P.2d 1178, 1180 (1985) (when witness rivets her attention upon a person, reliability of a subsequent identification of that person is enhanced). All three witnesses provided similar and ultimately accurate descriptions of Quimayousie to police and expressed a high level of certainty in their identifications of Quimayousie. Finally, all three identified Quimayousie within 30 to 40 minutes after the shooting when the events were still fresh in their minds. For these reasons, the superior court did not abuse its discretion or commit legal error in allowing the three witnesses to identify Quimayousie at trial. *See Moore*, 222 Ariz. at 7, ¶ 17, 213 P.3d at 156.

II.     Identification Instruction

**¶11**        After the court found that the circumstances surrounding the identifications were not "unduly suggestive" and the identifications were reliable, it allowed the State, over Quimayousie's objection, to withdraw its request for the "standard" identification instruction, Revised Arizona Jury Instruction 39. That instruction read as follows:

> The State must prove beyond a reasonable doubt that the in-court identification of the defendant at this trial is reliable. In determining whether this in-court identification is reliable you may consider such things as:
>
> 1. the witness' opportunity to view at the time of the crime;
>
> 2. the witness' degree of attention at the time of the crime;
>
> 3. the accuracy of any descriptions the witness made prior to the pretrial identification;

4. the witness' level of certainty at the time of
the pretrial identification;

5. the time between the crime and the pretrial
identification;

6. any other factor that affects the reliability of
the identification.

If you determine that the in-court identification
of the defendant at this trial is not reliable, then
you must not consider that identification.

Rev. Ariz. Jury Instr. ("RAJI") Stand. Crim. 39 (4th ed. 2015).

¶12          On appeal, Quimayousie argues the superior court abused its discretion in allowing the State to withdraw its request for this instruction. *State v. Bolton*, 182 Ariz. 290, 309, 896 P.2d 830, 849 (1995). We reject this argument.

¶13          Consistent with the "use note" for this instruction and our prior case law, a court must give this instruction when it has concluded—using current terminology—the pretrial identification procedures were "inherently suggestive." *E.g. State v. Osorio*, 187 Ariz. 579, 582, 931 P.2d 1089, 1092 (App. 1996); *see infra* ¶ 3. And, more recently, this court has recognized a court should give a cautionary instruction to the jury alerting it to the dangers of identification evidence when a defendant has presented evidence that a pretrial identification was made under suggestive circumstances that call into question the reliability of the trial identification testimony. *State v. Nottingham*, 231 Ariz. 21, 26, ¶¶ 12-14, 289 P.3d 949, 954 (App. 2012).

¶14          Here, as noted, the superior court did not find the circumstances surrounding the pretrial identifications "unduly" suggestive. And, most importantly, none of these circumstances brought the reliability of the witnesses' trial identifications into question. *See infra* ¶ 10. Under these circumstances, the superior court did not abuse its discretion in allowing the State to withdraw its proposed identification instruction.

¶15          Nevertheless, as we recognized in *Nottingham*, eyewitness testimony presents serious and significant risks. *Id*. at 27, ¶ 15, 289 P.3d at 955 (discussing authorities). Given these dangers, and the importance of reliability when such evidence is presented, we encourage trial courts to

instruct the jury on the factors it should consider in determining whether to consider an in-court identification reliable. Such an instruction will provide the jury with a meaningful framework within which to evaluate the reliability of a pretrial identification.

III.    Denial of Severance

**¶16**        Quimayousie next argues the superior court should have severed the misconduct charge from the other charges.    Under the circumstances presented here the superior court did not abuse its discretion in refusing to sever the charges.[4]  *State v. Garland*, 191 Ariz. 213, 216, ¶9, 953 P.2d 1266, 1269 (App. 1998) (appellate court reviews ruling on severance for abuse of discretion).

        A.    Factual Background

**¶17**        The superior court found the State had properly joined the counts because the offenses were based on the same conduct.  *See* Ariz. R. Crim. P. 13.3(a)(2) (joinder).  The superior court further ruled joinder would not be unduly prejudicial, stated it would "sanitize" the evidence of Quimayousie's prior juvenile adjudications, and instructed the jury to limit its consideration of the evidence.

**¶18**        The jury heard limited evidence of Quimayousie's prior adjudications.  One witness testified Quimayousie had "prior adjudications for felony offenses" and that his right to possess a weapon had not been restored.  The rest of the evidence concerning the prior adjudications came through a stipulation.  Before the superior court read the stipulation to the jury, it instructed it that it would hear evidence that Quimayousie had been adjudicated delinquent for a felony and that the evidence was relevant only to the count of misconduct involving weapons.  The superior court further instructed the jury, "You are not to consider this information for any other purpose."  That stipulation informed the jury that Quimayousie had twice been adjudicated for an unidentified felony and identified the two juvenile cause numbers, the dates of the two offenses, and the dates of the adjudications.  In the final instructions, the superior court again instructed the jury that the prior adjudication evidence was relevant only to the count of misconduct involving weapons, and it could not consider the evidence

---

[4]Quimayousie was a prohibited possessor because of two prior juvenile felony adjudications.  *See* Ariz. Rev. Stat. ("A.R.S.") § 13-3102(A)(4) (2012) (misconduct involving weapons based on prohibited possession).

for any other purpose and had to decide each count separately based on the evidence and law applicable to that count, uninfluenced by its decision on any other count.

      B.     Discussion

      1.     Law on Severance at the Time of Trial

**¶19**      "Severance of joined offenses is required as a matter of right if the offenses are joined only by virtue of their same or similar nature; otherwise they may be severed at the trial court's discretion." *Garland*, 191 Ariz. at 216, ¶ 8, 953 P.2d at 1269; Ariz. R. Crim. P. 13.4(b). Severance is also required, however, when "necessary to promote a fair determination of the guilt or innocence of any defendant of any offense." Ariz. R. Crim. P. 13.4(a).

**¶20**      Under the circumstances and the governing law then in existence, the superior court did not abuse its discretion in refusing to sever the misconduct charge from the other charges. The State properly joined the offenses pursuant to Rule 13.3(a)(2) and severance was not otherwise required to promote a fair determination of guilt or innocence. Further, our supreme court has instructed us that we must presume a jury follows its instructions. *See State v. Newell*, 212 Ariz. 389, 403, ¶ 68, 132 P.3d 833, 847 (2006).

      2.     *State v. Burns*

**¶21**      Nevertheless, Quimayousie relies on *State v. Burns*, 237 Ariz. 1, 344 P.3d 303 (2015), to support his argument that severance was required even though the supreme court had not yet issued this opinion at the time of his trial. In *Burns*, our supreme court found the superior court had abused its discretion when it failed to sever a count of misconduct involving weapons from counts of murder, kidnapping, and sexual assault because evidence of the defendant's prior felony convictions would not otherwise have been admissible in the guilt phase of the case. *Id*. at 14-15, ¶¶ 34-37, 344 P.3d at 316-17. The court further found, however, that because of the overwhelming evidence of guilt, the error was harmless. *Id*. at ¶ 38.

**¶22**      Here, as in *Burns*, the evidence of Quimayousie's guilt was overwhelming. As explained above, *see supra* ¶¶ 4-6, witnesses saw Quimayousie as he approached the park, saw him shoot the victim, and

saw him run away.[5] As he attempted to hide, Quimayousie sent text messages from his phone to two friends and sought their help. He told the first friend, "Come through [friend] I just. Bucked on sum niggazzzzs [sic]."[6] That friend responded he was on his way and asked Quimayousie's location. Quimayousie texted a second friend and said, "I just bucked on sum niggaz come through!!!!!!" Quimayousie texted his location to the first friend several times, who again responded that he was on his way. That friend also told Quimayousie to wash his hands. Less than two minutes later, Quimayousie texted, "The Patty wagon is already. Here come quick!!!!!! [sic]" In a subsequent text, Quimayousie told the first friend he was wiping his hands.

¶23 When police arrived at the house where Quimayousie was hiding, several officers saw Quimayousie crouch behind a car as they approached him. They then heard the sound of a heavy metallic object hit the concrete under the car. That metal object turned out to be a handgun with Quimayousie's thumbprint on it. All of the rounds in the cylinder had been fired and Quimayousie had additional ammunition in his pockets. Although an expert could not positively identify or exclude Quimayousie's gun as the weapon that fired the bullet that killed the victim, the expert testified Quimayousie's gun had "likely" fired the bullet. Given all the evidence, the superior court's refusal to sever the misconduct charge did not affect the jury's verdicts.

IV.    *Batson* Challenge

¶24 Quimayousie, a Native American, next argues the superior court should have granted his challenge to the State's peremptory strike of Juror 37, the only Native American panel member, pursuant to *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719, 89 L. Ed. 2d 69 (1986) (prosecution may not strike a potential juror solely on account of the juror's race). We will not reverse a superior court's decision on a *Batson* challenge unless it is clearly erroneous. *State v. Lynch*, 238 Ariz. 84, 104, ¶ 67, 357 P.3d 119, 139 (2015). We defer to a superior court's findings regarding the State's motives for the strike, but review the court's application of the law de novo. *Id.*

---

[5]The victim's other sister did not participate in any pretrial identification procedures, but identified Quimayousie at trial and was "positive" he was the person who shot the victim.

[6]The victim was African American.

¶25     Here, the superior court's rejection of Quimayousie's *Batson* challenge was not clearly erroneous. After Quimayousie established a prima facie case of racial discrimination, the State provided race-neutral explanations for the strike of Juror 37 that the superior court found credible and supported by the record. *Purkett v. Elem*, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770-71, 131 L. Ed. 2d 834 (1995) (first, the opponent establishes a prima facie case; then, the proponent must come forward with a race-neutral explanation; finally, the trial court must decide if the opponent has proved purposeful racial discrimination). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 768, 115 S. Ct. at 1771. The State explained:

> One, she's one of the jurors that did not have children, which was an issue for us in regard to our selection of a jury in this case.
>
> In addition, she'd indicated that she testified against a supervisor within the tribe, and she seemed somewhat gratified or satisfied in the fact that she had taken this on, which caused us some concern about her ability to get along with other jurors.
>
> Of most concern was the fact that she did not initially share that she had a conviction but shared that a little bit later, and when she did share it you followed up with her about whether or not in light of that fact she could still be fair. She hesitated before she answered her question to you.[7]

¶26     Given the age of the victim and others involved in the case, the State's strategy of selecting jurors with children was facially valid. *Newell*, 212 Ariz. at 401, ¶¶ 53-54, 132 P.3d at 845 (prosecutor's burden to

_____

[7]The State offered a fourth reason, arguing an Internet search revealed Juror 37 had once been and may still be a journalist, something she did not reveal at any point. Quimayousie admitted he also found such information, but argued she wrote her last article years earlier. There is, however, nothing in the record but counsels' arguments to suggest Juror 37 was ever a journalist. For this reason, the superior court declined to consider that factor in its determination, and we also decline to consider this factor.

give a race-neutral explanation for a strike is satisfied by a facially valid explanation). Further, the manner in which a prospective juror answers questions can also be a proper basis for a peremptory strike—here, Juror 37's perceived satisfaction with having testified against a tribe supervisor. *State v. Hernandez*, 170 Ariz. 301, 305, 823 P.2d 1309, 1313 (App. 1991). The superior court was in the best position to assess the State's explanation on how her response suggested she might not be able to get along with other jurors. *Newell*, 212 Ariz. at 401, ¶ 54, 132 P.3d at 845 (on issues of credibility, "the trial court is in a better position to assess than is this Court"). Finally, although Quimayousie disagreed with the State's assertion that Juror 37 had been hesitant in affirming she could be fair despite her conviction, the superior court was in the best position to decide whether the juror had, in fact, hesitated as the State asserted.

¶27        Quimayousie argues the State's explanations were pretextual, however, because other jurors who were ultimately seated on the jury, Jurors 106, 119, 126, and 129, had criminal convictions. Quimayousie also notes Juror 126 also had no children. First, the State has a limited number of peremptory strikes and cannot strike everyone who does not fit the State's mold of the ideal juror for a specific case. A party must sometimes accept a juror that is not ideal to preserve a strike for a juror who is even less ideal. It is unlikely the jury ultimately selected will be completely uniform in characteristics a party considers favorable and/or unfavorable. Second, the State did not strike Juror 37 because she had a criminal conviction. The State struck her because it believed she hesitated when the court asked her if she could be fair and impartial in light of her treatment during her prosecution. The State also believed Juror 37 was not as forthcoming about her conviction as she could have been. Under these circumstances, the presence of Jurors 106, 119, 126, and 129 on the jury does not establish purposeful racial discrimination.

¶28        Finally, Quimayousie argues the State should have questioned Juror 37 further if it had genuine concerns regarding her. The State's decision not to ask Juror 37 more questions does not establish that its strike was pretextual. *Lynch*, 238 Ariz. at 104, ¶ 70, 357 P.3d at 139.

V.    Juror Misconduct

¶29        Quimayousie next argues the superior court abused its discretion when it denied a mistrial after Juror 2 engaged in misconduct by researching the time of sunset on the date of the murder and the meaning of the term "bucked" as used in Quimayousie's text messages. *State v. Hall*, 204 Ariz. 442, 447, ¶ 16, 65 P.3d 90, 95 (2003).

¶30        Juror misconduct requires a new trial only if the defendant proves actual prejudice or "if prejudice may be fairly presumed from the facts." *State v. Nelson*, 229 Ariz. 180, 184, ¶ 12, 273 P.3d 632, 636 (2012) (quoting *State v. Davolt*, 207 Ariz. 191, 208, ¶ 58, 84 P.3d 456, 473 (2004)). In the context of extrinsic information, as is the case here, we will not presume prejudice without proof the jury received the extrinsic information and considered that information in its deliberations. *Id*. We find no abuse of discretion because Quimayousie has failed to prove actual prejudice and we cannot fairly presume prejudice from the facts.

¶31        After learning of the misconduct, the superior court spoke with each juror to learn the extent of his or her exposure to the extrinsic information. Jurors 1, 5, 8, 9, 11, and 14 were not aware that anyone had consulted outside sources. Juror 3 heard Juror 2 admit in the jury room that she went online to look up the time of sunset, but did not hear Juror 2 mention a time. Juror 3 heard unidentified jurors tell Juror 2 that she should not have done that and the discussion stopped.[8] Juror 6 was also in the jury room when he heard an unidentified person say he or she had found out the time of sunset, but the person never actually said the time other than to suggest it was earlier than what another juror suggested. Juror 6 assured the court he could disregard all of this.

¶32        Jurors 4 and 15 were at lunch with Juror 2 when Juror 2 told them she looked up something on the Internet. Jurors 4 and 15 immediately stopped Juror 2, told Juror 2 they did not want to hear any more, and got up and left. It is not clear whether Juror 7 was with the group or simply nearby during lunch, but Juror 7 heard someone mention doing research, saw Jurors 4 and 15 leave and heard them admonish Juror 2. Juror 2 then told Juror 7 that she had looked up the word "bucked" and told her the definition(s), and Juror 7 also immediately admonished Juror 2 and left. Juror 7 did not recall the definition(s) of "bucked" Juror 2 told her. Juror 7 assured the court she could base her decision solely on the evidence admitted at trial. Juror 2 did not tell anyone other than Juror 7 that she looked up the definition of "bucked" and never told anyone else what she thought it meant.

¶33        Based on the jurors' responses, the superior court denied Quimayousie's motion for mistrial, excused Juror 2, reconstituted the jury with an alternate juror, and ordered the jurors to begin deliberations anew.

---

[8]While Juror 3 thought Juror 1 was present when this occurred, Juror 3 admitted she did not know which jurors actually heard the discussion. Again, Juror 1 denied he heard anything.

The court explained to the jury that "everything that happened with the previous jury is wiped out and you're gonna start anew as a brand new group of 12 starting from scratch." The court then formally instructed the jury:

> Members of the jury, I have replaced a deliberating juror with an alternate juror. The alternate juror will now be a deliberating juror. Please do not speculate or guess about the reasons for this change.
>
> You remain under the admonitions previously given to you. You are also required to follow the final jury instructions previously provided and read to you.
>
> You are to start your deliberations anew, starting with . . . selection of a jury foreperson. You are to begin deliberating with full and detailed discussion about all the issues as though the previous deliberations had not taken place. Any preliminary or final decisions you may have made about any aspect of the case must be set aside and discussed anew. You shall not consider any part of your prior deliberations and/or discussions, including any prior votes or any decisions you may have previously made about the case.

The reconstituted jury began its deliberations shortly before noon and returned its verdicts shortly after noon the next day. The record contains no evidence that Juror 2's misconduct actually prejudiced Quimayousie.

VI.     Dismissal of the Premeditated Murder Charge

¶**34**          Quimayousie argues the superior court should have barred the State from dismissing the first degree murder charge based on premeditation. We disagree. "Choosing which offense to charge and prosecute is within the discretion of the prosecutor." *State v. Lopez*, 174 Ariz. 131, 143, 847 P.2d 1078, 1090 (1992). The State may withdraw a theory of first degree premeditated murder after the close of evidence and proceed solely on a theory of first degree felony murder. *Id.*

¶35      Here, the State charged Quimayousie with a single count of first degree murder, but alleged alternate theories of premeditated and felony murder. *See* Ariz. Rev. Stat. ("A.R.S.") § 13-1105(A)(1) and (2) (2012). At the conclusion of the evidentiary portion of the trial, the superior court held the evidence supported an instruction on second degree murder as a lesser-included offense of first degree premeditated murder. Given the superior court's ruling, the State elected to dismiss the premeditation theory and proceed solely on the felony murder theory. Thus, the superior court properly dismissed the premeditation theory.

VII.      Refusal to Instruct on Lesser-Included Offenses

¶36      Quimayousie argues the superior court should have instructed the jury on lesser-included offenses of first degree murder even though the only charge of murder that remained was first degree felony murder. We reject this argument; there are no lesser-included offenses to felony murder. *Davolt*, 207 Ariz. at 213, ¶ 92, 84 P.3d at 478.

## CONCLUSION

¶37      For the foregoing reasons, we affirm Quimayousie's convictions and sentences.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama